**UNITED STATES of America, Appellee,**

v.

**John IANNELLI et al., Defendants-Appellants.**

**Nos. 725–727, Dockets 71–2123, 71–2126, 72–1108.**

United States Court of Appeals, Second Circuit.

Argued April 20, 1972.

Decided May 22, 1972.

Irving Anolik, New York City (Lanna, Coppola & Rosato, Yonkers, N. Y., on the brief), for defendant-appellant Iannelli.

David A. Pravda, New York City, for defendant-appellant Tortora.

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City, on the brief), for defendant-appellant Squires.

Robert T. Hartmann, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the S. D. of N. Y., John W. Nields, Jr., Asst. U. S. Atty., on the brief), for appellee.

Before WATERMAN, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

John Iannelli, John Tortora and Frank Squires appeal from judgments of conviction entered on September 16, 1971 in the United States District Court for the Southern District of New York after a four day jury trial before Lawrence W.

Pierce, J. Appellants were each found guilty on one count of conspiring to misapply the funds of a federally insured bank, 18 U.S.C. §§ 656 and 371, and on five counts of aiding and abetting the misapplication of such funds, 18 U.S.C. §§ 656 and 2.[1] We affirm the convictions.

I

The origins of this case date back to 1965. At that time, appellant John Iannelli had both a personal checking account and outstanding commercial loans with the County Trust Company in Yonkers, New York. Walter J. Michaels, an assistant treasurer at the bank, had handled these loans on the bank's behalf. In April 1965, Michaels met with the bank's regional vice president to discuss Iannelli's indebtedness. The vice president instructed Michaels not to loan any further money to Iannelli. That instruction, however, proved futile; several schemes, including the one charged as unlawful here, were devised to circumvent the rule. The details of those schemes were provided by Michaels himself, who was named as a defendant in the indictment but pleaded guilty prior to the commencement of the trial and agreed to testify for the Government.

At first, Michaels manipulated the bank's records so that Iannelli's personal account would not show substantial overdrafts. Michaels's efforts were helped in March 1966 when Iannelli opened another account with the bank under the name Sioux Realty Construction Corporation with Iannelli and his wife listed as corporate officers and signatories. There is evidence in the record that both Iannelli and Tortora were owners of Sioux and that Squires was "Field Manager" of the company. In any event, Michaels used the Sioux account to protect Iannelli's personal checking account from appearing to be overdrawn. Michaels further testified that during this period he met once with Iannelli alone and twice with Iannelli and Tortora to discuss these juggling maneuvers. The latter two meetings were arranged by Squires, who phoned Michaels using the name "Spears."

On April 6, 1966, Squires again called Michaels to arrange another meeting at the offices of Sioux Realty. Present at the meeting were Iannelli, Tortora and Michaels; apparently Squires was there but left shortly after Michaels arrived. During the course of the ensuing discussion a new plan for extending the bank's credit to Iannelli was agreed upon: Iannelli and Tortora promised to send five individuals to the bank to whom the bank would make loans through Michaels, who was then to take the proceeds and credit the Sioux account. It was this scheme that formed the basis of the indictment.

The following day Squires appeared at the bank to take out a loan under the pseudonym "Spears." Michaels filled in the amount ($2,500) and the purpose of the loan (to purchase a 1963 Cadillac) although Squires already owned such an automobile and Michaels knew it. When Michaels gave Squires a check for $2,500, Squires immediately cashed it and returned the money to Michaels. Later Michaels deposited the money in Iannelli's accounts. According to Michaels's testimony, a similar scenario was followed when each of the four other straw men for Iannelli came to the bank to borrow funds. During this period of sham loans Iannelli and Tortora also met with Michaels on two more occasions to discuss their financial manipulations. As before, Squires contacted Michaels to notify him of the meetings.

The auditor of the bank estimated at trial that, as a result of all these events,

1. Squires was sentenced to concurrent terms of imprisonment of one year on each count; Tortora was sentenced to concurrent terms of imprisonment of 18 months on each count; and Iannelli was sentenced to concurrent terms of imprisonment of 18 months on three counts (the conspiracy count and two substantive counts) and given a suspended sentence and a period of probation on the remaining three counts.

the total amount loaned to various people was $69,000, which remained outstanding at the time he testified.

## II

Appellants raise several arguments for reversing their convictions. Since in our view only the arguments advanced by Squires are substantial enough to warrant extended discussion, we only briefly consider the contentions of appellants Iannelli and Tortora before moving on to discuss Squires's arguments.

Both Iannelli and Tortora argue that there is insubstantial evidence in the record to support their convictions and that the nearly five-year delay between the Government's discovery of the alleged unlawful acts and the return of the indictment violated the sixth amendment speedy trial clause, the fifth amendment due process clause and Fed.R.Crim.P. 48(b). As to the claim of insufficient evidence, we think it clearly refuted by the summary of the Government's case given in Part I of this opinion. With regard to the claim of pre-indictment delay, appellants are foreclosed by United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), from resting their argument on either the sixth amendment or Rule 48(b). And to succeed under the fifth amendment due process clause they must at least show that they suffered actual prejudice in preparing a defense. See United States v. Marion, *supra,* at 324–326, 92 S.Ct. 455;[2] United States v. Briggs, 457 F.2d 908, 911 (2d Cir. 1972); United States v. Capaldo, 402 F. 2d 821, 823 (2d Cir. 1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969). A determination of the constitutional issue in this context requires in the words of Justice White, "a delicate judgment based on the circumstances of each case." United States v. Marion, *supra* at 325, 92 S.Ct. at 466. The circumstances of this case, we believe, dictate a finding that the delay did not result in a constitutional violation. Iannelli concedes that actual prejudice has not been "conclusively demonstrated";[3] and Tortora claims only that he might have found witnesses among those present at a bar during one of the meetings between Iannelli, Michaels and himself who would have contradicted Michaels's version of that event. Under the facts of this case, appellants' claims of prejudice are too speculative for us to say that they have been deprived of a fair trial. We also note that the Government explained in an affidavit submitted to the trial court that the reason for the delay was "that the events in this indictment were but a small part of an investigation into allegations against these defendants of extortion activities in Yonkers, New York, from 1966 through 1970." Such a reason is certainly a "legitimate consideration in law enforcement." United States v. Briggs, *supra,* 457 F.2d at 911.

The remaining arguments of these appellants are that Iannelli's motion for acquittal should have been granted because Michaels's testimony "substantially exonerated" him and that Tortora was prejudiced by one of the prosecutor's remarks during summation and by the judge's charge regarding it. These claims are simply without merit.

Squires's arguments in this court, on the other hand, are more substantial. His principal claim is that the

2. In rejecting petitioner's claim that the pre-indictment delay violated the due process clause, the Court in *Marion* stated that "No actual prejudice to the conduct of the defense is alleged or proven, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." United States v. Marion, *supra,* 404 U.S. at 325, 92 S.Ct. at 466. It is unclear from the opinion whether a successful claim under the due process clause must establish both actual prejudice and intentional delay on the part of the Government or whether a showing of the former alone would be sufficient. In any event, neither appellant has made a substantial claim that there was prosecutorial gamemanship here.

3. Appellant's Brief at 25.

Government failed to satisfy its burden of showing that he knowingly joined with Michaels in wilfully misapplying the bank's funds with intent to injure or defraud the bank. See United States v. Fortunato, 402 F.2d 79, 80 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S. Ct. 1205, 22 L.Ed.2d 463 (1969); Benchwick v. United States, 297 F.2d 330, 332 (9th Cir. 1961). His participation as a straw man in the April 7 loan transaction, he asserts, cannot support the inference that he knew that Michaels would apply the loan proceeds to Iannelli's benefit or that such application would violate the bank's policies. Thus, Squires concludes, the trial court improperly refused to grant his motion for entry of a judgment of acquittal.

We are unpersuaded by these arguments.[4] The inference is very strong that Squires went to the bank on April 7 to borrow money at Iannelli's behest. Equally clear, we think, is that the jury was entitled to conclude from the evidence before it that Squires knew the loan proceeds were to be used for Iannelli's benefit. Squires had arranged meetings between Iannelli and Michaels on several occasions; and, as already indicated, when he went to the bank on April 7 he did so at Iannelli's direction. Moreover, his apparent readiness to sign, under an assumed name, the fraudulent loan application and then immediately transfer the funds to Michaels suggests at least that Squires knew Iannelli was to be a beneficiary of this charade. It could hardly be said that Squires expected Michaels to keep the money Squires had just transferred to him. We also think that there was sufficient support for the jury's conclusion that

Squires knew at the time that Michaels's actions were contrary to the bank's rules. The Government, of course, was not required to show that Squires knew that Michaels was violating a specific directive from the bank's regional vice president. It was sufficient to show only the Squires knew that Michaels's actions in transferring the money to Iannelli somehow constituted a breach of the bank's rules. See Benchwick v. United States, *supra*, 297 F.2d at 332–333. Again, Squires's unquestioning participation in the obviously fraudulent loan transaction supports an inference of knowledge of irregularity. Thus, we think that the record in this case, when considered as a whole, supports the inference that Squires shared the intent of Michaels to injure or defraud the bank and to get money improperly into the hands of Iannelli. The evidence of guilty knowledge in this case, in our view, is much greater than was true in those decisions relied on by appellant. See Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); Morei v. United States, 127 F.2d 827 (6th Cir. 1942).

One further question remains: whether the evidence was sufficient to establish that Squires was aware that the scheme to misapply the bank's funds went beyond his one loan transaction and involved other similar illegal acts. The question is important because Squires was convicted of being a conspirator in a scheme involving four other instances of misapplication similar to his own and of being an aider and abet-

4. We need not decide here whether the proper standard of review in this case is, as appellant contends, the one stated in United States v. Glasser, 443 F.2d 994, 1006 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971) (whether "there is 'relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt,' that the accused is guilty") or that formulated by Judge Hand in United States v. Fein-

berg, 140 F.2d 592, 594 (2d Cir.), cert. denied, 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944) (whether there is "substantial evidence" to support a finding of guilt) and recently reaffirmed by a panel of this court in United States v. Coblentz, 453 F.2d 503, 506 (2d Cir. 1972), since we believe the evidence is sufficient to sustain the conviction under either standard.

ter in each of those misapplications. To be sure, a person shown to have joined a conspiracy can be held liable not only for the conspiracy but also for all substantive offenses committed by his fellow co-conspirators in furtherance of the conspiratorial objectives. See Pinkerton v. United States, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). The applicability of that rule to a given case, however, depends upon the Government's showing that the defendant had some reason to believe that the conspiracy was broad enough to encompass those acts.

Although the question in this case is close, we think the evidence was sufficient on this issue. Squires maintains that he was, in effect, a minor employee ignorant of the schemes of Iannelli and Tortora, but there was evidence to the contrary. The loan application listed Squires as "Field Manager" of Sioux Realty. As already indicated, Squires obtained $2,500 in a false transaction to obtain money for Iannelli's use. Moreover, Squires knew that the conspiracy included not only Iannelli and Michaels but also Tortora. Indeed, on one occasion Squires called Michaels to arrange a meeting between Michaels and Tortora at a cafe and to say that Tortora had a check he wanted deposited in the Sioux account. Thus, Squires had reason to believe that something peculiar was going on involving the bank and Tortora, as well as the bank and Iannelli. It is not ordinarily necessary for a depositor to meet a bank official in a cafe to make a deposit. Also of significance is the fact that Squires arranged further meetings between Iannelli and Tortora and Michaels after his April 7 loan, supporting the inference that Squires knew he was part of a continuing conspiracy. It is true that considered alone each of these bits of evidence might be insufficient to prove the requisite knowledge. But we need not consider them in isolation, and together they were enough to put the issue to the jury.

The judgments of conviction are affirmed.