## Commonwealth vs. Mamie Ann Best
## (and a companion case[1]).

Middlesex.   May 8, 1980. — September 5, 1980.

Present: Hennessey, C.J., Kaplan, Wilkins, Liacos, & Abrams, JJ.

*Homicide. Practice, Criminal,* Directed verdict, Trial of defendants to-
gether, Instructions to jury. *Constitutional Law,* Speedy trial, Admis-
sions and confessions, Self-incrimination. *Evidence,* Cross-examina-
tion, Admissions and confessions, Relevancy and materiality.

At the trial of a mother and her son for the murder of the mother's hus-
band, there was sufficient evidence, when taken with the inferences
that could be reasonably drawn therefrom, to warrant the denial of
the mother's motions for a directed verdict and the finding that she
was a joint venturer with her son in the premeditated murder of her
husband. [481-483]
In the circumstances, there was no merit to the claim of two defendants
that the Commonwealth was chargeable with a delay of three years
and eight months between the date of a homicide and indictment of
the defendants on murder charges and that they were prejudiced by
such delay. [483-486]
At the trial of a mother and her son charged with the murder of the
mother's husband, the judge did not err in refusing to sever the trial
but instead entering a redaction order to prevent the disclosure of any
portions of the son's out-of-court statements which implicated the
mother. [486-490]
At the trial of a mother and her son charged with the murder of the
mother's husband, the judge did not unduly limit the mother's cross-
examination of a prosecution witness in refusing to allow inquiry
about matter that would implicate both the witness and the son in the
murder of the son's wife; nor was the son prejudiced by certain ques-
tions on cross-examination of the witness which alluded to the son's
participation in his wife's murder. [490-491]
At a criminal trial, there was sufficient evidence to warrant the judge's
finding that an interview of the defendant by an insurance investigator
and a Massachusetts State police officer in a sheriff's office in South
Carolina where the defendant was living was not custodial. [491-495]

---

[1] Commonwealth vs. John R. McCown.

At the trial of a defendant charged with the murder of his stepfather, the judge did not abuse his discretion in permitting a witness to testify to a "jovial" exchange between the defendant and his homosexual lover in which the defendant responded with apparent enthusiasm to his lover's suggestion that the stepfather be disposed of. [495-496]

At a criminal trial, the judge did not err in advising the defendant that he could not claim his Fifth Amendment privilege to avoid answering questions about a murder charge of which the defendant had been acquitted if such questions were shown to be relevant, and in refusing to give an advisory opinion as to what his evidentiary rulings on the relevance of such testimony might be. [496]

At a criminal trial, in the context of the judge's entire charge to the jury, his remark on the importance that no innocent person be convicted and the equal importance that a guilty person be convicted could not have caused the jury to convict on a lesser standard than proof beyond a reasonable doubt. [496-498]

At the trial of two defendants for murder on a theory of joint venture, the judge did not err in his instructions on joint venture, and he was not required to give a charge sua sponte on accessory after the fact. [498-499]

INDICTMENTS found and returned in the Superior Court on June 16, 1978.

The cases were tried before *Young, J.*

*Alice E. Richmond (Barry C. Klickstein* with her) for Mamie Ann Best.

*Thomas D. Edwards (Jeffrey M. Graeber* with him) for John R. McCown.

*Pamela L. Hunt & Robert M. Raciti*, Assistant District Attorneys, for the Commonwealth.

KAPLAN, J. Upon indictments dated in June, 1978, the defendants Mamie Ann Best and her son John R. McCown stood trial for fourteen days in April-May, 1979, and were found guilty by a Middlesex County jury of the murder in the first degree on October 25, 1974, of Fayne Adams, husband of Best and stepfather of McCown. The defendants appeal direct to this court arguing various errors claimed below, and also, in reliance on G. L. c. 278, § 33E, certain errors freshly claimed here. We recount the facts as the jury might have apprehended them, at the same time indicating more or less the trail of the investigators of the crime. Then

we take up Best's contention that she deserved a directed verdict of acquittal (McCown has abandoned any such claim as to himself). Sundry legal points affecting both defendants or either are dealt with and we conclude that the judgments of conviction should be affirmed.

1. *Narrative.* (a) About 1 A.M., October 25, 1974, Holliston police Officer Donald Haynes, answering a radio report based on a call from one Mary Ann Thistle, proceeded down Central Street and spotted a four-door Ford Torino car that had evidently run off an S-curve on that road and into an embankment. The driver's door was open, the headlights were on, the car was in gear, and the ignition key in the on position, although the engine had died. On the back floorboard was sprawled the body of the victim Adams (age, fifty-three; height, five feet ten inches; weight, 230 pounds), dead of twenty-six lacerations of the head. The interior and sides of the car were much bloodied, but blood was not found in the area about the car. On the front floorboard Haynes found a blood-covered crowbar which, according to the medical examiner's later study, could have been the fatal instrument; also found was a rock that evidently had been used to weight down the accelerator. Despite the considerable blood in the car, the evidence, as described and analyzed by Sergeant W. Lawrence Marsell (who among other officers reached the scene), suggested that the victim had not been killed in the car but had been dispatched at another location and dragged into his car,[2] and the car driven down Central Street and abandoned.

(b) Papers in the car identified the body. By 4:15 A.M. the police arrived at the house of the victim and Best located at 229 High Street, Holliston, some five to seven minutes' drive from the site at Central Street, and set back 150 yards from the road in a heavily wooded, isolated area.

On inspection before entering the house, the police found a pool of blood, ten to twelve inches across and 1 1/2 inches

[2] The inference followed from the position of the body in the car and the way the victim's clothes were disposed about the body.

deep, about fifteen feet to the side of the house at the driveway's edge. There were several bloodstains on the cement step and screen door at the back entrance to the house.[3]

Best, a slight woman (height, four feet eleven inches; weight, seventy-eight to 115 pounds) answered the back door. The officers told Best her husband had been in an accident, and let her change her clothes when she asked to be taken to the hospital, but she was then told without detail that her husband had "passed away." Thelma Midyette, a friend, was summoned to calm her.

Best was questioned about events of the evening.[4] It appeared that Adams worked as a lieutenant for the Pinkerton company with duties of assigning Pinkerton employees to patrol local businesses, arranging replacements when employees called in as unavailable, and sometimes filling in himself. Adams kept long and erratic hours. On the night of October 24, according to Best, Adams arrived home about 6:50 P.M. Between 7 and midnight, Best said, Adams napped, ate dinner, and received and placed several telephone calls. Around 7:30 Adams received the first of three calls. This informed him that a Pinkerton employee could not work that night. According to Best, a second call was received around 9 o'clock. This made Adams angry; Best heard him say, "I'll meet you any place," and, "Well, you know the contract. You be there at quarter till." As Adams hung up, he said "Oh, those damn kids. They'll drive me crazy." Adams then dressed, left the house, and returned thirty minutes later. He did not explain nor did Best know the reason for his absence. A little after 11:30 Best answered a wake-up call from Pinkerton Sergeant Raul Baez; Adams told Baez that because he had overslept, he would not go by the plant Baez was guarding, but instead would go direct to

---

[3] The blood outside the house and in the car was human blood but the Commonwealth chemist was unable to type it.

[4] Best now gave the first of five essentially consistent accounts of what happened that night. Variations of the narrative (which we do not recite fully) were given October 26, 1974, November 6, 1974, April 13, 1976, and in May, 1977. Best repeated the substance of this account at trial.

his midnight shift. (The first and third calls were later veri-
fied by the police; the second remained unverified.)

About 11:50 or 11:55 the back doorbell rang. Adams
answered the door and told the person or persons there who
had arrived in a car that he would be right out. As Best was
ironing clothes at the time, she did not see the visitors, but
thought they were Pinkerton trainees whom Adams had
mentioned at dinner. As Best said goodbye to Adams in the
kitchen (her last sight of Adams), she looked out the window
and could make out two pairs of legs as they leaned against
the front of their car which pointed at Adams' Torino. Thus
ended Best's account.

While at the house that morning Sergeant Marsell saw
two droplets of blood at the base of the bathroom toilet, and
a benzidine test applied to Best at 7 A.M. revealed a trace of
blood on her left hand.[5] When told of the test result, she
said, do "you think I killed my husband?" Although claim-
ing not to have known until November 6 that Adams had
been murdered,[6] Best was looking in the yard of her house
on October 26 for blood or signs of struggle.

(c) We interpolate the comment that at this stage a
suspicious mind might not have dismissed the thought that
Best could have been implicated in the homicide. But the
police apparently could not picture so small a woman con-
tending physically with Adams, and McCown was not yet
in the picture. The police were rather led from Best's ac-
count to investigate several Pinkerton employees, and par-
ticularly Baez, who had earlier been in an argument with
Adams about Baez's pay and work schedule.[7]

---

[5] It may be noted that the benzidine reagent test gives a positive reac-
tion in the absence of blood if certain vegetable pulp is present.

Best said Adams had cut himself shaving that evening in the bathroom.

[6] Apparently it was only on that date that the police told Best that
Adams had been murdered rather than accidentally killed. It does not
appear of record that Best ever viewed Adams' body.

[7] Baez fell under at least momentary suspicion for the further reason
that he owned a car resembling one that sped by Officer Haynes as he
made his way down Central Street. See also Baez's grand jury testimony,
infra.

The police again interviewed Best at the house on October 26. McCown was present, as was his homosexual lover Mike Bertram, called the "Marquis Di Jon," but the police made no inference as to McCown. They did not then know of the very close attachment of McCown to Best. Again on November 9, 1974, Best was interviewed at some length at the Holliston station. About this time the police with Best's permission examined Adams' safety deposit box. This held several insurance policies on his life. The material was returned to Best when on November 18 Best with others moved to South Carolina. The murder remained an ongoing investigation.

(d) In February, 1976, John J. Healy, an investigator for CNA Insurance Co., was instructed to look into Adams' death, in accordance with the company's practice of investigating claims arising within three months of a policy's effective date, here September 28, 1974. Healy put himself in touch with the Massachusetts authorities with an understanding to share information. Evidently the Marquis spoke with Sergeant Marsell and Detective John F. Burns of the Massachusetts State police shortly after Healy came on the job.[8] Healy now learned through records kept by parking lots at Boston's Logan airport that a 1967 Oldsmobile Cutlass car registered to McCown in South Carolina had been parked there from October 25, 1974, at 11:31 A.M. until November 18, 1974, at 7:52 A.M. (the day of the return to South Carolina).

There was also a significant interview with Kenneth Coldwell, for whom Best worked regularly as a babysitter. Coldwell said he was in Best's house about 9 A.M., October 25. Best and Midyette were awaiting a call from the Marquis. He, Coldwell, took a call from South Carolina to the effect that the Marquis would be arriving in Boston at 9 P.M. that night. Coldwell drove Best and Midyette to Logan that evening. The three met the Marquis coming off

---

[8] The content of the communication was not disclosed at trial. The Marquis died in April, 1977.

a plane from Charlotte, North Carolina. As they reached the baggage area, McCown appeared carrying a suitcase. He said he had had trouble finding the airport, and indicated to Coldwell that his car was there.

That McCown may have arrived in his car at Holliston before the murder, was suggested by Edward Shea about a month after the murder. He said that on October 24, 1974, hitchhiking home to Holliston from his job in Natick, he was picked up around noon by a man named "John"[9] from South Carolina. At the trial Shea testified that John's car was a blue Chevrolet Chevelle or Malibu but the jury learned through cross-examination of Marsell that Shea had earlier identified the car as a blue 1967 Oldsmobile Cutlass. John said he was coming up to see his parents in Holliston. He needed directions to a part of town known to Shea as High Street. Shea, however, could not identify McCown as the driver from photographs two or three months after the incident, nor could he identify him at the time of trial.

The investigators learned also by a telephone interview in July, 1976, of an episode in South Carolina in July or August, 1974 witnessed by one James H. Bell. (Bell's testimony was admitted in evidence only as to McCown.) Bell was acquainted with McCown and the Marquis and heard them discussing how much they wanted Best to return to South Carolina. Suddenly the Marquis jumped up and said "Let's knock this guy off," meaning Adams. McCown responded by waving his arms and shouting, "Hey, hey, hey."

(e) Healy decided around April, 1976, to talk to McCown about his movements at the time of the homicide. He interviewed McCown in Timmonsville, South Carolina, on April 14, 1976. McCown said Venigee Fryar, Best's sister in South Carolina, telephoned him in the early hours of October 25, 1974, to say that Adams had been killed.[10] So, he

---

[9] The defense pointed out that McCown was known as "Robbie." John said he hadn't seen his parents for nine years but in fact McCown had seen them within the year.

[10] Best claimed that Fryar had been informed of the death by Midyette's calling her on October 25 from Best's house. This would corroborate Mc-

said, he flew to Boston on the evening of October 25 and met Best and two others at the airport. He said, further, that he had no car in Massachusetts; that on his return to South Carolina with Best two cars were used, a Ranchero and a Cadillac, both owned by Best. (Adams' smashed Torino was sold.) Best, when interviewed by Healy on April 13, 1976, told a story confirming McCown's.

In July, 1976, Healy and Burns interviewed McCown in the office of the sheriff of Florence County, South Carolina. (This interview was the subject of a motion to suppress.) When confronted with the evidence of his parking his car at Logan airport, McCown admitted he had lied, and now said he had driven up because he had quarreled with the Marquis and wanted to see Best. He said he started at 10 A.M., October 24, and drove nonstop to Boston, arriving around 4 A.M., October 25, and had then checked into a Framingham motel (whose name he did not remember) without getting in touch with anyone. Later that morning he heard on the radio that Adams had been killed. He said he called the Marquis, contrived to make it appear that he and the Marquis had flown to Logan together, and then went to Logan to try to join with the Marquis in getting off the plane. But he did not show up at the right gate and so had to meet the group at the baggage area. He had lied, he said, because he feared he would be blamed for Adams' death. On the return to South Carolina on November 18, he had driven his car. Later he sold it.

(f). The investigators could now suspect on the basis of all the foregoing that McCown's arrival by car in Massachusetts was not, as McCown stated in his amended tale, around 4 A.M. of October 25, but earlier, in time for him to take his part in the homicide.[11]

---

Cown's statement about receiving word from Fryar early on October 25, but, as will be seen, McCown's statement must be considered false. (Midyette had died by the time of trial and Fryar evidently was unavailable.)

[11] It appeared that a call was placed from Best's house to McCown's number on October 23 at 11:46 P.M. This would leave enough time for a drive to Holliston before midnight of October 24. The Commonwealth

On May 17, 1977, Samuel Joe Cole, McCown's lover after the Marquis, gave a statement about a confession by Mc-Cown. (The statement was received only as to McCown; and the question of Cole's bias was gone into extensively at trial.) Cole had accompanied McCown to the sheriff's office in July, 1976, for McCown's interview with Healy and Burns. Emerging from the interview, McCown said he thought the interrogators believed he had killed Adams. Cole asked if that was so, and McCown said it was, he had driven from South Carolina to Massachusetts for the purpose of killing Adams and had killed him with a crowbar.[12]

(g) In May, 1977, Best was still confirming McCown's original, and by him abandoned, story that he had taken the flight to Boston and had no car in Massachusetts. Also in May, Best gave an exemplar of her handwriting, and this takes us back to the insurance policies. There had been a build-up of policies on Adams' life. At trial the Commonwealth introduced six such policies. Five policies were taken out after his marriage to Best in March, 1971 (Best's fourth marriage, Adams' second). Four policies were written within a year of Adams' death, the latest effective less than a month before that event. A National Service life policy issued before marriage paid $20,000 on death. Two policies with Mutual of New York issued at different dates in 1973 paid $10,000 and $20,000 if death was accidental. An Imperial Casualty Co. policy of April, 1974, paid $25,000 but only if death occurred while "riding in, operating,

---

suggests that Best's statement that she spoke to McCown on the phone at the time might be false, and that McCown had left for Holliston earlier, in time for the encounter with Shea around noon of October 24.

[12] Cole said he told the Florence, South Carolina, sheriff about Mc-Cown's confession as early as August, 1976. Apparently the South Carolina police did not react to this and Massachusetts authorities were hampered in attempting to interview Cole because of the pending prosecution for the October, 1976, murder of Diane McGee McCown, Mc-Cown's bride of nineteen days.

The cross-examination of Cole by Best's counsel in the present case dwelt in part on Cole's admitted involvement in the murder of Diane McGee. See points 4 and 5 below.

entering or alighting" from any "four wheel vehicle of the private passenger, station wagon or jeep type." A May, 1974 policy with National Casualty Co. paid $5,000 for an accidental death in aircraft or $10,000 for such death elsewhere. (Adams apparently satisfied a policy condition by serving currently in the National Guard, taken to be part of the armed services).

The largest policy, a CNA Insurance Co. policy paying $50,000 for accidental death, placed through a Carte Blanche credit card, became effective September 28, 1974. Elizabeth McCarthy, a handwriting expert, testified for the Commonwealth that three-quarters of the CNA application form, including Adams' signature, had been forged by Best (an unknown party, not McCown, had completed the form); also that Best intentionally disguised the May, 1977, handwriting exemplar she had given the CNA investigator.[13] With the exception of a minor portion of the $10,000 Mutual policy, Best was the sole beneficiary of all the policies, standing to gain as much as $101,000. In fact, it appeared by the time of trial that about $78,000 had been collected after settlements and with additions of interest. This was used in part to buy a new car for McCown.

(h) In statements to police and at trial Best spoke of her loving relationship with Adams. Baez, however, after initially refusing cooperation with the police, finally told the grand jury and repeated at trial that he had had an adulterous affair with Best continuing to within two weeks of the murder, and that she called Adams a "bald-headed bastard."[14]

2. *Denial of Best's motions for directed verdict of acquittal.* The Commonwealth tried the case on the theory that Best and McCown were joint venturers in the murder of

---

[13] The defense countered with a handwriting expert, Theresa Sacco, who testified that she could not tell from exemplars whether Best or Adams had filled out the CNA application.

[14] In testimony at trial, Best denied the affair with Baez. There were some affectionate letters from Adams to Best.

Adams. On this theory there surely was evidence enough to carry the case to the jury as to McCown, and in fact he does not complain here of the denial of his motions for a directed verdict. Best does raise the question as to herself (posed by a motion at the close of the Commonwealth's case, see *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 [1976], and a renewed motion at the close of all the evidence; the record is such that the motions need not be considered separately). It is fair to say that the case against Best was not as strong as that against McCown. Nevertheless we think the trial judge did not err in submitting her case to the jury, taking for purposes of these motions a view of the evidence most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

The jury could have found the following. On Best's part, there were motives of collecting insurance proceeds and ridding herself of a relationship with Adams that had become odious and returning to South Carolina to join her son there. She forged the CNA policy. Whether a signal to McCown to come to Massachusetts to perform the murderous deed was given on the night of October 23, or earlier, he arrived by car, in time. McCown killed the victim with a crowbar, the process beginning at the High Street location and possibly ending there. The body was driven from the scene, among other reasons because the place of the crime would point to Best as a responsible party. Best was near the violence, ready, at the least, to give aid if needed. She recited a story to point suspicion away from herself and Mc-Cown as to the events around midnight of October 24. The two venturers coordinated a story about the movements of McCown. A demonstration by firm evidence that that joint story was false led with accumulating force to the fastening of guilt on both actors. Proceeds of insurance were received by Best and used in part for the benefit of McCown.

Sharing a common design and assisting in its execution, Best could be found guilty beyond a reasonable doubt on the Commonwealth's theory of the premeditated murder of Adams. See *Commonwealth* v. *Soares*, 377 Mass. 461, 471-

472, cert. denied, 444 U.S. 881 (1979).[15]  That the case against Best was "circumstantial" in some sense of that dubious term does not suggest that the proof was insufficient.  *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 54-55 (1975).  *Commonwealth* v. *Smith,* 350 Mass. 600, 604-607 (1966).  A web of convincing proof can be made up of inferences that are probable, not necessary.  See *Commonwealth* v. *Medeiros,* 354 Mass. 193, 197 (1968), cert. denied sub nom. *Bernier* v. *Massachusetts,* 393 U.S. 1058 (1969).

Best has argued that the evidence was consistent equally with her being an accessory after the fact to McCown's murder of Adams, which would relieve her of all legal guilt by reason of her being the "parent" of the principal felon. G. L. c. 274, § 4.  But this would not take account of the evidence of her forgery, and much else.  She argues that proof of mere "consciousness of guilt" is insufficient to convict of crime (see *Commonwealth* v. *Montecalvo,* 367 Mass. 4N, 52 [1975]), but there was more to the Commonwealth's case than that, and evidence of such a state of mind "may turn the scale where the evidence is conflicting."  *Commonwealth* v. *Fancy,* 349 Mass. 196, 201 (1965), quoting from *Credit Serv. Corp.* v. *Barker,* 308 Mass. 476, 481 (1941).

3. *Preindictment delay.*  Adams was found murdered on October 25, 1974, but indictment did not come until June 16, 1978, not quite three years and eight months later. By pretrial motions made on January 25, 1979 (Best), and January 29, 1979 (McCown), it was charged that "important evidence, including material witnesses are no longer available," resulting in such prejudice as to bring to bear due process protections and justify dismissal of the indictments.  The motions were denied on April 18, 1979.

---

[15] The case was submitted to the jury on a theory of murder "with extreme atrocity or cruelty" as well as a theory of premeditated murder. The evidence of twenty-six lacerations with a crowbar is sufficient for a finding on the first-mentioned theory (see *Commonwealth* v. *Golston,* 373 Mass. 249, 260 [1977], cert. denied, 434 U.S. 1039 [1978]; *Commonwealth* v. *Knowlton,* 265 Mass. 382, 389 [1928]), and such murder may be imputed from the actor to his partner in the crime.  See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 347 (1979).

Delay between criminal event and indictment can have destructive effect on a prosecution where the accused is able to carry the burden of showing that his defense was substantially prejudiced and that the "delay has been intentionally undertaken to gain a tactical advantage over the accused or has been incurred in reckless disregard of known risks to the putative defendant's ability to mount a defense." *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 688, 691 (1979). See *United States* v. *Marion*, 404 U.S. 307, 324 (1971). Plainly the burden of establishing the constitutional violation is a heavy one. See *United States* v. *Lovasco*, 431 U.S. 783, 790 (1977).

As presented to the judge, the pretrial motions were virtually self-defeating, for they were without any substantial factual support: no affidavits were filed, nor was an evidentiary hearing applied for or held; the defendants relied on oral argument and memoranda of law. Compare *Commonwealth* v. *Horan*, 360 Mass. 739 (1972) (twelve days of hearing); *Commonwealth* v. *Imbruglia, supra* (affidavit and evidentiary hearing). General or conclusory allegations on such issues are insufficient for the drastic remedy of dismissal. See *Commonwealth* v. *Jones*, 360 Mass. 498, 501 (1971); *United States* v. *Marion, supra* at 326; *United States* v. *Avalos*, 541 F.2d 1100, 1108 (5th Cir. 1976), cert. denied, 430 U.S. 970 (1977).

Even if the defendants were indulged to the point of bringing in all that is now known about the case after trial (and this, despite the defendants' failure to renew their motions during trial), the judge's pretrial conclusion would remain intact. The case was complicated, hard to put together. See *United States* v. *MacClain*, 501 F.2d 1006, 1010 (10th Cir. 1974); *Commonwealth* v. *Crawford*, 468 Pa. 565, 570 (1976). Initially there was a quite logical investigation among Pinkerton employees. If we accept the verdict, suspicion had been falsely cast in that direction (consider Best's account of Adams' departure from the house). Then the defendants left the State, embarrassing recourse to them. See *Scherling* v. *Superior Court*, 22 Cal. 3d 493, 496

(1978). By July, 1976, the Commonwealth was conjuring with inconsistencies in the stories about McCown's arrival in Boston, but a prosecutor could believe with reason that there was not evidence enough to warrant, still less to require him to rush to indict. See *United States* v. *Lovasco, supra* at 791.

By August, 1976, Cole had told South Carolina police about McCown's confession, but it appears that legitimate needs of the South Carolina authorities in bringing McCown to trial in February, 1977, in the Diane McGee affair (see note 12, *supra*), stood in the way of Massachusetts police until they were enabled to secure Cole's statement of May 17, 1977. See *United States* v. *Lovasco, supra* at 796; *United States* v. *Iannelli,* 461 F.2d 483, 485 (2d Cir. 1972). Also in May, 1977, Best's handwriting exemplar was obtained, important for linking her with the crime. From that point on the prosecution's task would consist in assembling and evaluating the evidence and deciding whether and how to prosecute. When the case "require[s] a necessarily subjective evaluation of the strength of the circumstantial evidence available and the credibility of [defendants'] denial," some delay is normal and justifiable. *United States* v. *Lovasco, supra* at 793.

It would be rather anomalous to vest defendants with a constitutional right to a perfect measure of efficiency and speed by the police in solving crimes and by prosecutors in making formal accusations. The obligations of the State are expressed in other terms, as we have seen.

One might be inclined, perhaps, to loosen the rules about preindictment delay in the defendants' favor, were the delay extreme or the prejudice severe. But courts have refused to dismiss indictments returned after longer delays.[16] And the claims of prejudice here are not compelling. The loss of

[16] See *United States* v. *King,* 560 F.2d 122 (2d Cir.), cert. denied, 434 U.S. 925 (1977) (five years); *Scherling* v. *Superior Court,* 22 Cal. 3d 493 (1978) (ten years); *State* v. *McCorgary,* 224 Kan. 677 (1978) (ten years); *State* v. *Haga,* 8 Wash. App. 481 (1973) (five years).

certain Pinkerton employee records is complained of, but there is no showing of ensuing injury to the defense (or even of an actual serious effort by the defendants to secure the papers). See *United States* v. *Shaw*, 555 F.2d 1295, 1298 (5th Cir. 1977). The Marquis died in April, 1977. There is allegation, but not proof, that he could have helped the defendants (see *United States* v. *Dukow*, 453 F.2d 1328, 1330 [3d Cir.], cert. denied sub nom. *Crow* v. *United States*, 406 U.S. 945 [1972]; *United States* v. *King*, 560 F.2d 122, 130 [2d Cir.], cert. denied, 434 U.S. 925 [1977]); the indications of record rather are that he would have been unhelpful.[17] Midyette died at an unascertained date before trial; it remains very doubtful what she could have contributed. Mary Ann Thistle did not appear at trial. There was no showing that she was unavailable. Thistle reported the car on Central Street but there is no reason to think she played more than a bit part. The defendants assert, finally, that they were prejudiced by a dimming of the memories of witnesses through the passage of time. The examples given do not persuade.

The trial judge was well supported in his conclusion that "the Commonwealth is in no way responsible [or] chargeable with that delay [October, 1974, to June, 1978], and that the prejudice which the defendants claim rests upon the fact of their memories dimming, and that alone is inadequate to trigger the due-process protections . . . ."

4. *Severance and related problems.* Relying primarily on *Bruton* v. *United States*, 391 U.S. 123 (1968), and the right of confrontation thereby secured, Best moved before trial for an order severing her trial from McCown's. Best pointed to statements McCown had allegedly made — Healy, Burns, and Cole might have been the hearers — which could implicate her in the murder of Adams. The Commonwealth thought the problem might be obviated if the witnesses were carefully instructed not to repeat any of Mc-

---

[17] As indicated in text above note 8, the Marquis apparently stimulated investigation that drew attention to McCown.

Cown's statements that tended to implicate Best, and after in camera review of the statements the judge agreed. "[T]here must be excised from the statements of Mr. Mc-Cown anything that in any way directly or indirectly inculpates Mrs. Best": specifically, the judge ordered excised from the testimony of Burns, Healy, and Cole reports of statements by McCown concerning possible motive for killing Adams; insurance; agreement between McCown and Best about realizing money from Adams' death, or splitting that money; existence or contents of letters between McCown and Best; the Marquis's blackmail of McCown based on those letters; statements by the Marquis. The prosecutor was ordered to instruct the three witnesses about hewing to these lines, and the judge in addition held a voir dire in which he assured himself that they understood. The result was a procedure which Best's counsel termed "exemplary," although he had excepted to the judge's refusal to sever. Cf. *Commonwealth* v. *McGrath*, 358 Mass. 314, 321-322 (1970); *Commonwealth* v. *Carita*, 356 Mass. 132, 139 (1969).

We do not understand Best to argue that the redaction order could have been improved on, or even that the witnesses were remiss. Best rather stresses three related problems that arose in the course of trial which suggest, she thinks, that there should have been a severance after all.

(a) Bell's testimony was not subject to redaction because it did not implicate Best, but on Best's motion the judge gave a limiting instruction, satisfactory to counsel, that Bell's testimony could "in no way" be used in the case against Best. The prosecutor in his closing argument, referring to Bell's testimony, argued that McCown had decided to kill Adams in July, 1974, so that Best could return to South Carolina. He went on: "What is happening in July, also? . . . [A]n application is being made out that Elizabeth McCarthy said is not the writing of Fayne Adams but the writing of Mrs. Best, . . . a policy for $50,000. So that those are the things that are happening right at that time, to show motive, to show the intention of these parties. It was for that money as well as the other policies." Although no objection to this re-

mark was registered at trial, Best argues (invoking G. L. c. 278, § 33E) that it implicitly violated the limiting instruction by tying Bell's testimony about McCown to Best's forgery of the CNA application. But it was open to the prosecutor to argue distinct (though converging) motives on the part of the two defendants, and the context suggests that that is what the prosecutor was doing. We add that the jury heard not only the limiting instruction but also a reference to that instruction in the final charge. See *Commonwealth* v. *Corradino*, 368 Mass. 411, 420-421 (1975).

(b) Best argues for the first time on this appeal that the close bonds ("unusual closeness") between McCown and herself precluded her in a joint trial from a line of defense she now thinks "most obvious" — trying to fasten blame on McCown for the murder proper and then contending that she merely helped dispose of the body, thus qualifying as an accessory after the fact. It may be enough to say that the embarrassment of possibly incompatible defense strategies as between Best and McCown was not called to the judge's attention as a reason for severance. Had the point been raised in the form indicated, we think the judge would not have abused his discretion in finding it unpersuasive of a need for severance. See *Commonwealth* v. *French*, 357 Mass. 356, 376 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972).

(c) Best says the joint trial interfered impermissibly with her counsel's cross-examination of Cole. Counsel tried to show Cole's bias against McCown and Best and his general lack of credibility — counsel sought to portray Cole as a "deranged man." Thus counsel inquired about Cole's escalating and even bizarre responses when McCown declared his intention to marry Diane McGee and when he eventually married her. So also counsel elicited Cole's hostility toward Best because of her attempts to break up Cole's relationship with her son. Further, counsel was permitted to get into the terrain of the murder of McGee (see note 12 *supra*). McCown was acquitted of that murder by a South Carolina jury in February, 1977. Cole had earlier pleaded

guilty to being accessory before and after the fact, and he appeared as a prosecution witness at McCown's trial. Counsel in cross-examining Cole in the present case tried to suggest that Cole had murdered McGee and had sought deliberately and falsely to implicate McCown so that the two could live together in prison. Attacking Cole's story of Mc-Cown's collaboration in the McGee affair, Best's counsel hoped to do much damage to Cole's credibility.

The range permitted to counsel on cross-examination was considerable even though these were events some two years after the Adams murder. But, on objections by the assistant district attorney and McCown (to be considered also at point 5), the judge ruled that Best could not inquire about matters that "directly would inculpate Mr. McCown in the murder of Diane, and so much of the testimony as directly relates to Mr. Cole's involvement in that crime"; this primarily to avoid needless prejudice to McCown. Best expressed disagreement with the ruling and made an offer of proof but did not renew her motion for severance (see the suggestion that this be done when developments at trial bring forth new possibilities of prejudice, *Commonwealth* v. *Corradino,* 368 Mass. 411, 420 n.8 [1975]).

Indeed the present argument is not so much grounded on the failure to sever as on the right to cross-examine adequately. But the scope of the examination, particularly, perhaps, when directed to showing a witness's bias, rests in the reasonable control of the trial judge. *Commonwealth* v. *Sandler,* 368 Mass. 729, 737-738 (1975). *Commonwealth* v. *Carroll,* 360 Mass. 580, 589 (1971). It is significant that the examination showed chiefly bias against McCown who nevertheless was insisting on some confinement of the questioning (see point 5). In all the circumstances, we cannot say that the judge abused his discretion in respect to Best. See *Commonwealth* v. *Sperrazza,* 379 Mass. 166, 169 (1979); *Commonwealth* v. *Haywood,* 377 Mass. 755, 758-763 (1979); *Commonwealth* v. *Dougan,* 377 Mass. 303, 309 (1979). The limit imposed was surely not so severe as to present a constitutional problem under *Davis* v.

*Alaska*, 415 U.S. 308 (1974). See *Commonwealth* v. *Francis*, 375 Mass. 211, 214, cert. denied, 439 U.S. 872 (1978).

5. *Best's cross-examination of Cole: Effect on McCown.* Just as Best criticizes the trial judge for limiting unduly her cross-examination of Cole, so McCown seeks to argue that the judge allowed Best undue latitude, prejudicial to McCown, for example, through suggesting the guilt of McCown in the McGee homicide.

A number of tendentious questions in the cross-examination passed without any objection by McCown; these included one that made a passing reference to "Robbie's trial," and another that elicited the answer by Cole: "Me and Robbie [McCown] did discuss going to California as soon as he got rid of Diane." When the direct question was put, "What do you claim Robbie planned with you and in [*sic*] murdering his wife at that particular point?," the assistant district attorney objected. Only then did McCown's counsel object to "questioning of this witness any further in reference to the murder." After the offer of proof by Best's counsel out of the jury's hearing, the assistant district attorney and McCown's counsel renewed their objections, and the judge sustained them and said he would sustain further objections to questions that would directly involve McCown or Cole in the crime (see the ruling quoted in point 4). On resumption of cross-examination, questions were put to which either the assistant district attorney or McCown's counsel registered objection. The assistant district attorney objected to four questions — about Cole's presence at the murder scene, where Cole took McGee's body, whether McCown told Cole he was going to Scranton to establish an alibi for the McGee murder, and when Cole was arrested for the murder. All objections were sustained. McCown's counsel objected to two questions, whether McCown telephoned Cole to discuss the question of killing McGee (objection sustained), and what Cole first told the police he knew about the murder (objection overruled, but answer: Cole said he knew nothing of the murder).

McCown argues that the aggregate of these references in the cross-examination of Cole by Best's counsel was damag-

ing to him, but, first, we think the allusions in the lengthy cross-examination did not seriously divert attention from the case at hand; second, no claim of cumulative prejudice was made at the time. There is no palliation here for failure to object. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 425 n.16 (1978); *Commonwealth* v. *Adams*, 374 Mass. 722, 729-730 (1978). McCown indeed concedes that trial counsel should have interposed objection earlier. The silence, however, may well not have been inadvertent. The Commonwealth suggests that McCown's counsel was not reluctant to see Cole attacked, even through examination regarding the McGee murder, and therefore he refrained from objecting to various questions. Only when the questioning became directly threatening to McCown himself, did McCown object to "further" questioning about details of McGee's death. Indeed it was the assistant district attorney who by his objections seemed the more solicitous of McCown's interests. As to the judge's specific rulings, in the place where objection by McCown was overruled, Cole's answer was bland; other rulings appear correct and helpful to McCown. We reject argument (pitched on G. L. c. 278, § 33E) that, notwithstanding lack of objection, the judge should have curtailed still further the references to the McGee affair.

We should add that whereas, by the cross-examination proper, the jury were not informed that McCown had stood trial for the murder of McGee or what part he might have played in that episode, the defense finally produced evidence that bore as much as McCown's relation to McGee as any question objected to on cross-examination. Three prisoners testified that Cole said he was going to accuse McCown falsely of complicity in the acts. From this testimony the jury could learn that Cole had accused McCown of murdering McGee and that McCown had been arrested for the crime.

6. *Whether McCown interview was custodial.* The trial judge, after hearing, denied McCown's motion, joined in by Best, to suppress evidence of McCown's interview with

Healy and Burns in July, 1976, the substance of which has been described above; and both defendants claim the denial was error.[18]   It is agreed that McCown was not given Miranda warnings; the question is whether the interview amounted to a "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedon of action in any significant way." *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966).[19]

We turn then to the facts as found by the judge, with some additional detail drawn from the testimony at the suppression hearing and trial.   When, in July, 1976, Healy and Burns went to Florence County to speak with McCown and others, they informed the county sheriff's office of their presence as a "courtesy."   They learned that McCown was living with Cole in a trailer in Timmonsville and went there but got no response.   Next morning, after asking at the sheriff's office for permission to use a room to question Mc-Cown, they returned to the trailer accompanied by two deputy sheriffs.   With Healy and Burns waiting nearby, the deputies approached the trailer; Cole answered and said McCown was out.   The deputies told Cole that Healy and Burns were in town and would like to speak with McCown at the sheriff's office.   Then the deputies left, having indicated to Healy and Burns that they thought McCown was in the trailer.   Within ten minutes Cole drove by with Mc-Cown in the passenger seat, and Healy and Burns followed

---

[18] In view of our conclusion as to McCown's motion to suppress, we need not enter on the exact interest of Best in this motion.

The defendants moved to suppress their respective statements to Healy on April 13-14, 1976, but the correctness of the judge's denial of those motions is not challenged on the present appeal.

[19] There was uncertainty below as to which side had the burden on the custodial character of the interrogation.   The judge indicated at the suppression hearing that the defendant had the burden, but did not refer to the matter in his findings.   We need not deal with it here, as there was proof sufficient even if the Commonwealth had the burden.   Cf. *Commonwealth* v. *Howard,* 4 Mass. App. Ct. 476, 479 (1976). Contrast *People* v. *Davis,* 66 Cal. 3d 175 (1976).

in their car. Cole observed them in his rear-view mirror and began to accelerate, as he thought they were prowlers of the previous night. The Healy car was able to draw up alongside Cole, and when Burns flashed his Massachusetts police badge Cole pulled over.[20]

Healy and Burns got out and identified themselves. McCown recognized Healy from the April interview. McCown and Cole said they were on their way to the sheriff's office to see what was wanted. Cole asked whether McCown was under arrest and Burns said no. The Cole car proceeded to the sheriff's office with Healy following, Healy being now uncertain of the way there.

Arriving at destination, Cole remained in the waiting area while McCown walked with Healy, Burns, and Deputy Sheriff Harkless into an interview room. They talked for about an hour. There was no recording apparatus. The door was closed but at one point Cole came in unsolicited to bring McCown a cool drink. Harkless tried to ask a question but McCown said he would not respond to Harkless and Harkless desisted. Burns testified that McCown was free to ignore any questions or leave; he was not a "suspect." We may assume, however, that the result of the interview was to focus attention on McCown.

When the interview was over, McCown left undisturbed with Cole. McCown had agreed to meet at a certain shopping mall with Healy and Burns and take a lie detector test. He did not appear and there was no follow up. It was more than two years before McCown was arrested.

The defendants point to the car chase and trip to the sheriff's office as indicative of constraint, but the judge found that "Cole and McCown were both relieved to learn that their pursuers were a police officer and an insurance investigator and not individuals acting out hostility toward homosexuals. I find that McCown had, in fact, actually planned to go to the Sheriff's Office and be interviewed

---

[20] The judge thought the "chase" was egregious but that did not disturb his conclusion as to the nature of the interview.

even before the chase ensued." Whatever coercion could be implied from the chase passed with the disclosure of identities, not to mention the express denial that McCown was under arrest. Voluntary travel to a police station is a factor suggesting that the investigation there is noncustodial (see *Commonwealth* v. *Simpson*, 370 Mass. 119, 125 [1976]; *Barfield* v. *Alabama*, 552 F.2d 1114 [5th Cir. 1977]); but, had McCown been asked to follow Healy and Burns, the later interview might still be conducted in an atmosphere free of pressure. See *United States* v. *Tobin*, 429 F.2d 1261, 1263-1264 (8th Cir. 1970); *Clark* v. *United States*, 400 F.2d 83, 84-85 (9th Cir. 1968), cert. denied, 393 U.S. 1036 (1969). That an interview occurs at an official place intimates a degree of coercion (see *Commonwealth* v. *Haas*, 373 Mass. 545, 552 [1977]), but of course does not itself brand an interrogation as custodial. See, e.g., *Furtado* v. *Furtado*, 380 Mass. 137, 146-147 (1980). Here the judge found that — at least from the interrogators' viewpoint — "the Sheriff's Office was used for the interview solely for convenience"; indeed only after they could raise no one at the trailer did Healy and Burns talk to the sheriff's office about using a room there.

Further, the judge found the interview "informal," with McCown having "a significant influence upon the contours of the interview" by controlling who might do the questioning. McCown, said the judge, was at liberty to end the interview at will. Though under some suspicion, he walked away from the interview and provoked no reaction when he did not perform as there agreed. See *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); *United States* v. *Scully*, 415 F.2d 680, 684 (2d Cir. 1969).

We accept the judge's findings of fact as warranted by the evidence (see *Commonwealth* v. *Simpson*, 370 Mass. 119, 125 [1976]), and, examining as independently as may be his inferences culminating in the conclusion that the interrogation was noncustodial (see *Brewer* v. *Williams*, 430 U.S. 387, 403 [1977]), we accept his conclusion as sound. The present case is in sharp contrast to *Commonwealth* v. *Haas*,

373 Mass. 545, 552 (1977), where we disagreed with a trial judge's conclusion that an interrogation was noncustodial: the defendant there was prevented from entering his own home, the scene of the murder; taken to the police station in a cruiser; refused information about his family during the ride to the station; asked a potentially incriminating question at the station immediately after being told of the death of his wife and children; and arrested when his answer did incriminate him.  Coercion had built up.  We concluded that Haas was under custodial interrogation when the first question was addressed to him.

7. *Testimony of Bell.*  McCown objected to the admission of Bell's account of the exchange between the Marquis and McCown in which McCown responded with apparent enthusiasm to the Marquis's suggestion that Adams be got rid of.  McCown claims the conversation was merely jocular: Bell himself characterized the conversation as "jovial." The judge's decision, after voir dire, to let the jury hear about the episode — limited to the case against McCown, and as probative of his then state of mind — was an implicit ruling that the risk of prejudice was not such as to forbid submitting to the jury for their assessment the value, if any, that should be assigned to McCown's reaction.  We have rarely interfered with a judge's decision whether to bar a jury from considering relevant evidence for fear of prejudicial side effects.  See *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 264 (1970); *Commonwealth* v. *Ellis,* 373 Mass. 1, 10 (1977).[21]  It does not materially alter the analysis to speak of McCown's

---

[21] The same point applies to the judge's admission in evidence, over the defendants' objection, of eight color photographs of the victim's head as it appeared at autopsy on October 25.  The usual claim was made that the pictures were inflammatory yet worth little as evidence, being merely corroborative of the medical examiner's account of the wounds. But the pictures bore on the charge of murder with extreme atrocity or cruelty, see *Commonwealth* v. *Bys,* 370 Mass. 350, 358 (1976); the depth and number of the lacerations could also say something about premeditation by the actor.  We cannot conclude that, weighing possible prejudice against evidential value, the judge commited error in admitting the photographs. See *Commonwealth* v. *Allen,* 377 Mass. 674, 679 (1979); *Commonwealth* v. *Jones,* 373 Mass. 423, 426-427 (1977).

reaction as a "threat" (if serious) against Adams, although not addressed to him. Cf. *Commonwealth* v. *Seit,* 373 Mass. 83, 90 n.5 (1977).

8. *McCown's election not to testify.* At voir dire, in response to a question from McCown's counsel, the judge said that, as McCown had been tried on the McGee murder charge, he could not be placed again in jeopardy upon it; hence he could not avoid answering questions about the subject by claiming a Fifth Amendment privilege. But, the judge added, he could only be asked such questions if the subject were shown to be relevant to the instant case, and "I am not so sure it is." He would not give "advisory opinions as to evidentiary rulings" concerning the relevance of McGee's death. He was warning McCown of the possible scope of cross-examination, but "I will have to make that decision [as to relevance] at the time." McCown was then asked whether he still wanted to testify, and he responded, "Yes. Oh, yes, I do." But after Best testified, counsel informed the court that McCown would not take the stand. It is claimed for the first time on appeal that the judge improperly scared McCown off testifying — burdened his election whether to take the stand. See *Griffin* v. *California,* 380 U.S. 609, 614 (1965); *Commonwealth* v. *Goulet,* 374 Mass. 404 (1978). We see no error: the judge was correct and fair in what he said; McCown's counsel could not have done better, and in any case was there to advise McCown fully.

9. *Instructions.* By reference to § 33E — since objections were not registered at trial — two attacks are now attempted on the judge's charge to the jury.

(a) The defendants make no claim that the judge's charge regarding reasonable doubt was objectionable, standing alone. We agree it was sound. Twenty-eight pages before that instruction the judge, in the passage set out in the margin,[22] called attention to the competing considerations of

---

[22] "Now, the administration of justice by impartial judges and juries is everybody's concern. The safety of society on the one hand and the security of an innocent person or person [*sic*] on the other, demands that

"the safety of society" and "the security of an innocent person," besought complete impartiality of the jurors as between the Commonwealth and the defendants, and then said, "It is terribly important that no innocent person be convicted, and it is equally important that a guilty person should be convicted." The defendants argue that the last remark so far "watered down" the charge on reasonable doubt that we should invoke our extraordinary power and order a retrial of the case. They cite, first, *Reynolds* v. *United States*, 238 F.2d 460 (9th Cir. 1956), where the judge, immediately after describing the presumption of innocence, charged that it was "intended to guard against the conviction of an innocent person, but it is not intended to prevent the conviction of any person who is in fact guilty, or to aid the guilty to escape punishment." *Id.* at 462. This allowed the jury to ignore the presumption of innocence if they thought the defendant "in fact" guilty, thus negating the presumption. The defendants' second citation is *Bumpus* v. *Gunter*, 452 F. Supp. 1060 (D. Mass. 1978) (S.C. *Commonwealth* v. *Bumpus*, 362 Mass. 672 [1972]). There the charge on reasonable doubt was weakened by several remarks, including certain rather inept examples drawn from daily life. Then the judge warned (in a remark derived from the charge reviewed in *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 [1926]) that insisting on proof greater than beyond a reasonable doubt would "break down the forces of law and order, and make the lawless supreme." These remarks were criticized as drawing attention to the harsh consequences of employing a standard of proof no one had suggested; and, "[w]hile these statements were more in

___

each and every one of us, you and I, be as absolutely impartial as we can possibly be between the Commonwealth and the defendants in cases of this nature. You men and women are called upon to put aside all considerations of race, color, religion, nationality, social position, and I am sure that you will do that, in an effort to be as independent as the lot of humanity will permit you to be. It is terribly important that no innocent person be convicted, and it is equally important that a guilty person should be convicted. If there is a breach, ladies and gentlemen, of either one of these propositions, then we cheapen human life."

the nature of observations than instructions, their effect was to warn the jurors against misapplying the test of reasonable doubt in favor of a defendant without warning them similarly against misapplying it in favor of the prosecution." *Bumpus, supra* at 1064.

In the present case there is some fear lest the "equally important" language be taken to dampen the requirement of proof beyond a reasonable doubt for conviction. In context, we think the listener would understand "equally" to mean no more than "also." Moreover it could be legitimately considered equally important to free the innocent and convict the guilty, provided proper standards, as described in the rest of the charge, were applied in each and every case. But if it be assumed that the questioned passage was itself unfortunate, it can be said with confidence that it was overwhelmed not only by a definite reference to proof beyond a reasonable doubt two pages ahead of that passage, but also by the full dress charge on the matter many pages later. There was no such immediate juxtaposition as in *Reynolds* or *Bumpus.* The jurors would take their guide from the specific instructions rather than a phrase of shorthand rhetoric. We look to the charge as a whole, see *Commonwealth* v. *Watkins,* 377 Mass. 385, 388, cert. denied, 442 U.S. 932 (1979), here praised by McCown's counsel as "very fair to the defendant." As in *Commonwealth* v. *Williams,* 378 Mass. 217 (1979), where a question was raised because of the judge's stress on the importance of dealing "firmly" with crime, "[c]onsidering the charge as a whole, we cannot conclude that the judge's instructions could have caused the jury to convict on a lesser standard than proof beyond a reasonable doubt." *Id.* at 234-235.

(b) Best now contends that the judge without prompting by any party should have given instructions on "accessory after the fact." This is really a suggestion that the charge on joint venture, as given by the judge, was erroneous, or would not be intelligible to the jury, without a supporting instruction that if the proof established only that Best was an accessory, it would not fulfil the requirements for con-

viction of murder on a joint venture basis. We think the joint venture instruction was itself correct and understandable (see *Commonwealth* v. *Scanlon*, 373 Mass. 11, 17-18 [1977]; *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 [1973]), and there is no ground for reversal for the judge's omission to give an ancillary charge sua sponte.

Upon a review of the entire record, we find no reason to exercise the § 33E power to order a new trial or direct entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*