Dale MILLER, Plaintiff-Appellant,

v.

ERIE LACKAWANNA RAILWAY CO., Defendant-Appellee.

No. 741, Docket 80–7527.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1981.

Decided March 26, 1981.

George M. Gibson, Buffalo, N.Y. (Damon, Morey, Sawyer & Moot, Buffalo, N.Y., of counsel), for plaintiff-appellant.

Ruth R. O'Keefe, Buffalo, N.Y. (Moot, Sprague, Marcy, Landy, Fernbach & Smythe, Buffalo, N.Y., of counsel), for defendant-appellee.

Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.

MANSFIELD, Circuit Judge:

In this relatively simple personal injury action by a railroad employee, Dale Miller, against the Erie Lackawanna Railway Company (Erie) under the Federal Employers' Liability Act, 45 U.S.C. §§ 51, *et seq.* (FELA), which was tried to the court without a jury in the Western District of New York, we are faced with the question of how much reliance can be placed on findings of a trial judge who, after hearing the defendant's motion to dismiss the action at the close of the plaintiff's case, waited four years before making findings based on his own incomplete notes. Upon this appeal from the judgment dismissing the action, the issue is whether the court erred in finding after its long, unexplained delay that Miller had not suffered any aggravation of a previous injury as a result of Erie's negligence. After a careful review of the trial transcript (prepared *after* trial judge's rulings) we are satisfied that the court's finding on the issue of causation of plaintiff's injuries is clearly erroneous and that the judgment must be reversed and the case remanded to the district court.

On September 7, 1973, Miller, an Erie employee, suffered a lumbar strain in his back while pulling railroad ties from under tracks, an injury that was not attributable to any negligence on Erie's part. However, on October 23, 1973, Erie sent Miller back to work after a period of convalescence, acting on the instructions of its physician, Dr. Samuel Militello, who had found Miller's condition to be improved and had issued a work slip which read "May resume work." The slip was premature since Miller was not yet capable of doing anything strenuous without danger to his health. The railroad's substitute foreman immediately put Miller to work "spiking," the act of driving spikes with a sledge hammer. When Miller told the foreman that this hurt his back, the foreman switched him to "nipping," which required him to thrust a 4–5 foot long rod weighing about 25 pounds down and under a railroad tie and then hang his weight on the rod to lift the tie. In the process of performing these strenuous tasks Miller injured his back in the same area as on September 7th, and was eventually switched to the job of throwing spikes to spots where they would be needed by the spiking gang. He suffered severe pain that night and, although he reported for work the following day, his pain prevented him from working. After seeing his family physician and an orthopedic surgeon, he was hospitalized, and underwent traction and a series of physiotherapy treatments.

On September 17, 1974, Miller brought suit against the railroad under the FELA,

seeking damages for aggravation of his injuries as a result of the railroad's having prematurely returned him on October 24, 1973, to full duty when it knew or had reason to know that because of his earlier injuries suffered on September 7, 1973, the work to which he was assigned on his return was beyond his physical capacity and would endanger his health.

The case was tried without a jury before Judge John T. Elfvin on April 13, 14 and 15, 1976. Miller's evidence consisted of his own testimony, that of several doctors and various medical records. The doctors were (1) Dr. Samuel Militello, the company-retained physician who had examined Miller after his original injury and on later occasions and had certified him as capable of resuming work; (2) Dr. Alberto Gonzalez, Miller's family physician who examined him on October 29, 1973, shortly after he had returned to work and then discontinued work because of the bad pain caused by his "spiking" and "nipping" duties, and who attended him thereafter; (3) Dr. Joseph C. Tedesco, an orthopedic specialist, who first examined Miller on November 8, 1973, hospitalized him, put him in traction and arranged for physiotherapeutic treatments; and (4) Dr. Joseph A. Syracuse, a physiotherapist, who administered daily physical therapy treatments in November and December 1973. Dr. Tedesco had examined and attended to Miller as a patient during his hospital stay and until December 23, 1973. Thereafter Miller continued to visit Drs. Syracuse, Militello and Gonzalez. In addition he apparently was examined by Drs. Martin Angelo and John Repicci.

On April 15, 1980, plaintiff rested his case, reserving the right to call Drs. Angelo and Repicci as rebuttal witnesses, and the defendant called one witness, Leo Zakowski, foreman of the track gang on which Miller had worked on September 7, 1973, through whom excerpts from a daily work record regarding Miller's accident on that date were introduced. Shortly thereafter Erie moved to dismiss the action.

The trial judge held Erie's motion under advisement for approximately four years.

On March 27, 1980, the judge filed a "MEMORANDUM and ORDER" granting the motion. The opinion, based upon the judge's notes of the trial (no transcript of the testimony yet having been prepared or made available), found that although Miller had failed to show that his September 7, 1973, accident was caused by any negligence on Erie's part, he had established that the railroad, through its agent Dr. Militello, was negligent in prematurely returning Miller to full duties on October 23, 1973, when he was not capable of performing such work. However, he denied liability on the ground that Miller had failed to establish that he had been injured or that his condition had been worsened or aggravated as a result of his having negligently been returned by Erie to full duty. Specifically the court found that, although plaintiff's physicians were of the view "that the spiking and nipping duties to which Miller had been assigned upon his premature return would be a medically competent producing cause of any resultant aggravation of his back injury ... no one, including plaintiff, said that there had been any such aggravation. Plaintiff said that the subsequent pain was the same as before his return to work."

Although Miller had testified in 1976, almost three years after the two accidents, that following the second accident he still had the same aching back as he had had for the previous weeks since the first accident, he described the pain immediately after the second accident as "bad," (Tr. 59) and stated that immediately after performing the task of "nipping" to which he had been assigned, "I started getting shaky, started sweating, and my back was starting to ... really aching." (Tr. 57). Moreover, the entire medical testimony, including that of the railroad's own examining doctor, and a series of doctors who treated Miller after the second accident, supported his claim that the second accident aggravated the pre-existing back injury and may have caused additional injuries.

Dr. Militello, the railroad's physician who sent Miller back to regular duties, testified with the aid of his contemporaneously made

medical records that immediately prior to instructing that Miller was fit to resume work he had found from successive examinations of Miller that by October 12, 1973, "his back had improved." (Tr. 181). Indeed, his October 19, 1973, notes state, "He improved to the point that while he had been doing lighter work, he was able to return to full duty." (Tr. 179). On November 5, 1973, he noted, "On 10/19/73 this man had improved." (Tr. 180). He also testified that he found Miller's complaints regarding his back after the second accident to be "different from those made after the first." (Tr. 185–86). The new complaints were of "radiating pain." When he had examined Miller after the first accident he had found no muscle spasm, only tenderness, and a normal alignment of the spine (Tr. 197–99, 203). He testified that prior to the second accident Miller had no "list of the spine to the right at the level of L4 and L5 and straightening of the usual curve" (Tr. 222).

Dr. Gonzalez, the physician who treated Miller after his second accident, testified explicitly that the work to which Miller had been prematurely returned in October was "an aggravating action" (Tr. 251), which brought back the injury that Miller had suffered after the first accident. (Tr. 251). Dr. Tedesco, the orthopedic specialist who examined Miller on November 8, 1973, shortly after his second accident and treated him thereafter, testified that Miller's injury was "due partly to the original injury sustained September 7th, 1973, and also subsequent injuries" and that the work he performed on October 24, 1973, "did aggravate" the pre-existing injury and condition. (Tr. 429–30).

Dr. Tedesco further found that Miller, after his second accident, suffered injuries that had been found by Dr. Militello not to exist after the first accident. On November 8, 1973, he found Miller to be suffering from a severe muscle spasm on both sides of his lumbar spine (Tr. 415), practically no motion in the lumbar spine (Tr. 416), and "a list of the spine to the right at the level of L4–L5, with straightening of the usual curve," which was revealed by an X-ray of the spine (Tr. 417). The foregoing medical testimony was corroborated by Dr. Syracuse, the physiotherapist who treated Miller throughout the period from November 11 to December 31, 1973, and on occasions in January, 1974. He testified that the work performed by Miller on October 24 was "the competent producing cause of the boy's complaints of severe pain in his lumbar area, shaking and nausea." (Tr. 386). In answer to the question "whether or not that work on the 24th aggravated his pre-existing condition," he testified: "I would say yes, definitely." (Tr. 389). Thus, in one form or another all of the doctors gave testimony contrary to the court's later finding and there was little or no testimony supporting it.

Plaintiff's counsel understandably moved immediately to vacate or modify the court's decision granting the railroad's motion to dismiss or for permission to reopen his case by calling Drs. John Repicci and Martin Angelo who would testify further on the issue of aggravation. On May 27, 1980, the judge filed a second "MEMORANDUM and ORDER" denying the motion and adhering to his earlier decision that Miller had failed to sustain his burden of proving a connection between the second accident and his injuries. Once again, lacking a transcript of the trial testimony and relying on his four-year old notes, the trial judge for the most part overlooked the foregoing extensive proof to the effect that the second accident aggravated the pre-existing injuries and was the competent producing cause of injuries complained of thereafter, except to note that the orthopedic surgeon (presumably Dr. Tedesco) had given some testimony along these lines which the court discounted because the doctor had last seen the patient in December, 1973 and his written report had referred only to the September accident. Dr. Tedesco's trial testimony, however, was specifically directed toward the effects of the second accident. Based on his notes the trial judge similarly brushed aside the testimony of the physiotherapist (Dr. Syracuse), which was likewise directed to the effects of the second acci-

dent. Thus, despite having based his original dismissal on his incorrect finding that "no one" had testified that there was any aggravation of the first injury, the trial judge, rather than obtaining from the court reporter a transcript of the relevant contrary testimony given by the doctors, instead decided the motion to vacate or modify also on the basis of his obviously incomplete notes, supplemented by such recollection as he had of testimony heard by him four years earlier.

## DISCUSSION

■ The oft-quoted liberal principle by which the trial judge, sitting as trier of the facts, was governed in ruling in this FELA action upon Erie's motion to dismiss is that the plaintiff would be entitled to recover if the court found that

> "employer negligence played any part, even the slightest, in producing the injury ... for which damages are sought." *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957).

See in accord, *Mileski v. Long Island R. Co.*, 499 F.2d 1169, 1171 (2d Cir. 1974); *Lindauer v. New York Central R. Co.*, 408 F.2d 638, 640 (2d Cir. 1969).

In reviewing the trial judge's finding, we, in turn, are governed by the clearly erroneous standard. F.R.Civ.P. 52(a). The issue before us, therefore, is whether the judge's finding that the October 24, 1973, (or second) accident, which was found to have been caused by Erie's negligence, was not the proximate cause of any injuries to Miller is supported by credible evidence.

■ Applying these standards, we conclude that although the severe pain suffered by Miller following the second accident may have been similar to the pain suffered after his first accident, the second accident did aggravate his injuries and cause additional injuries, as testified to by the medical experts who were better equipped by examination and training to make a diagnosis than he was. Their credibility has at no time been questioned by the trial judge. Moreover, the examination by

Dr. Tedesco and X-rays following the second accident reveal injuries that were not found by Dr. Militello after the first accident.

Under the circumstances the trial judge's finding that the new injuries and aggravation of pre-existing injuries were not caused by Erie's negligence in prematurely returning Miller to work must be rejected as clearly erroneous.

In view of the inevitable prejudice to the parties attributable to the trial judge's inexcusable delay, we direct that the mandate issue forthwith and that the case be given immediate priority by the district court. Should Erie offer no further proof on the issue of liability, judgment should be entered for the plaintiff on the issue of liability, with any additional evidence on the issue of damages to be introduced promptly, followed by a prompt decision. Costs to the plaintiff-appellant.