**UNITED STATES of America, Appellee,**

v.

**Barry D.W. CLARK, and Andrew Thomas Cook, Defendants-Appellants.**

**Nos. 783, 784, Dockets 84–1113, 84–1127.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 4, 1985.

Decided June 10, 1985.

Herbert L. Greenman, Buffalo, N.Y. (Palmer, Greenman & Hurley, Buffalo, N.Y., of counsel), for defendant-appellant Cook.

Robert M. Murphy, Buffalo, N.Y., for defendant-appellant Clark.

Rodney Personias, Asst. U.S. Atty., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Carol E. Heckman, Asst. U.S. Atty., Buffalo, N.Y., of counsel), for appellee.

Before MANSFIELD and PIERCE, Circuit Judges, and BARTELS, Senior District Judge.*

MANSFIELD, Circuit Judge.

Barry D.W. Clark and Andrew T. Cook appeal from judgments of the Western District of New York, John T. Elfvin, *Judge,* convicting them after a four-week jury trial of aiding and abetting a bank officer's misapplication of federally-insured bank funds in violation of 18 U.S.C. §§ 656 and 2,[1] and of interstate transportation of fraudulently-taken and converted checks of a federally-insured bank in violation of 18 U.S.C. § 2314[2] and 2. In addition, Clark appeals from a judgment convicting him after the same trial of conspiracy to commit the foregoing offenses, 18 U.S.C. § 371, and Cook appeals from a conviction for aiding and abetting the entry of false statements in bank records, 18 U.S.C. §§ 1005,[3] 2. Appellants' principal claims of error are that the trial judge erroneously instructed the jury as to elements of the crime of willful misapplication of bank funds and that the evidence was insufficient to support their convictions of that crime. We affirm.

The bank officer involved was Charles F. Edmunds, Assistant Vice-President and Manager of the Lockport, N.Y., branch of the Manufacturers & Traders Trust Co. (M & T), a bank insured by the Federal Deposit Insurance Corporation. Edmunds was authorized by that bank to lend without any superior's prior approval up to $75,000 of the bank's funds to any individual borrower. The $75,000 limit applied to the aggregate of loans made to any related or affiliated group of borrowers, such as a corporation, partnership, or other business entity and persons controlling or holding an office in it.

Beginning in the summer of 1979 and continuing well into 1980, Edmunds, with the knowledge and participation of Clark and Cook, was induced by them to violate these limits by lending them without supervisory approval bank funds in excess of $75,000 for use by them or their affiliated businesses. The businesses were (1) National Lease Company, in which Clark was one of two general partners, (2) Cook, Clark & Co. (CCC), an accounting firm in which Clark and Cook were at one time

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. In pertinent part, those sections provide as follows:

"§ 656. Theft, embezzlement, or misapplication by bank officer or employee

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
\* \* \* \* \* "

"§ 2. Principals

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
\* \* \* \* \* "

2. In relevant portion, § 2314 reads:

"§ 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting

"Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

\*     \*     \*     \*     \*     \*

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
\* \* \* \* \* "

3. Section 1005 reads, in pertinent part:

"§ 1005. Bank entries, reports and transactions

"Whoever, being an officer, director, agent or employee of any Federal Reserve bank, member bank, national bank or insured bank, ...

\*     \*     \*     \*     \*     \*

... makes any false entry in any book, report, or statement of such bank with intent to injury or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both.
\* \* \* \* \* "

partners but which no longer included Cook, (3) Summit Metals, a corporation owned and controlled by Clark, and (4) Rutter, Cook, Rutter (RCR), a company in which Cook was one of three partners. Clark and possibly Cook invested some of the loan proceeds in Monex International, Ltd., a non-affiliated company.

In some instances, in order to continue lending money to the defendants, who had exceeded their lending limits, the loans were made to affiliated businesses whose ties to one or the other defendant though known to Edmunds were not revealed in bank records. In other instances, loans were made to Clark and Cook at points when each had less than $75,000 in loans outstanding individually, even though each was ineligible because of loans outstanding to affiliated companies. In still other instances, loans were ostensibly made to friends of Clark and Cook (e.g., Kathy Logan, a secretary employed by National Lease; Jacqueline H. Cuillo, a former secretary for CCC; Andes Contracting, Inc., a dormant company formed by Cook's father, Hubert Cook) with the monies actually going to Clark, Cook or their affiliated businesses, all ineligible at the time of the loans. In none of the latter instances did the nominal borrowers at any time have the financial resources needed to repay the loans.

The following is a schedule of the principal loans, which shows the identity of the person or entity officially represented to the bank as the borrower, the person who signed the papers for the official recipient, the actual recipient of the funds, and the amount:

| Officially Named Borrower | Date | Signatory | Real Recipient | Amount |
|---|---|---|---|---|
| National Lease Co. | 6/22/79 | Leventhal | Clark & Leventhal | $72,000 |
| CCC | 7/11/79 | Clark | Clark | $71,000 |
| Kathy Logan | 9/10/79 | Logan | National Lease Co. | $25,000 |
| Kathy Logan | 10/2/79 | Logan | National Lease Co.'s Debts | $70,000 |
| Clark | 11/16/79 | Clark | CCC loan | $75,000 |
| Clark | 11/23/79 | Clark | CCC, Clark & Logan loan | $95,000 |
| Summit Metals | 1/31/80 | H. Cook as President | Clark's debts & investments | $75,000 |
| Cook | 1/31/80 | Cook | Cook & Summit Metals | $72,000 |
| RCR | 3/11/80 | Rutter | RCR, Edmunds, Cook | $36,000 |
| Andes Contracting | 3/24/80 | H. Cook | RCR, Cook's investments | $38,000 (in two loans) |
| Jacqueline Cuillo | 3/28/80 | Cuillo | Clark & other loans | $48,000 |

The first two of the above loans, $72,000 to National Lease and $71,000 to CCC, were made to provide funds for a failing company, Thermal Metals, in which Clark was an

officer and which was ineligible, because of outstanding loans by the bank to it, for a loan approved only by Edmunds. To facilitate the fraud upon Edmunds' supervisors, Thermal's business was continued under a new name, Caribe Metals, with a new list of officers.

The evidence was conclusive that Edmunds, Clark, and Cook knew at the time they borrowed funds that the loans were in excess of Edmunds' lending authority and would not have been approved by the bank if the real recipients of the funds and the affiliations of the borrowers had been revealed to Edmunds' supervisors. Indeed, at one point, when Edmunds resisted making further loans to Clark, Cook, or their affiliates, Clark induced Edmunds to make additional loans by threatening to reveal to bank superiors certain other improper loans Edmunds had made.

Following discovery of the frauds, Edmunds, pursuant to a plea agreement with the government that required him to testify if called, pleaded guilty in January 1982 to one count of an information charging him with conspiracy to misapply the M & T bank's funds, two substantive counts charging misapplication of the bank's funds and one count charging him with filing of a false personal income tax return. On February 16, 1982 a 12-count indictment against Clark and Cook was filed, charging them, *inter alia*, with conspiring with Edmunds to misapply the M & T bank's funds by using them to make a $75,000 loan to Clark and Cook, which exceeded Edmunds' lending authority, in the name of Summit Metals Holding Company.

Count II charged both defendants with aiding and abetting Edmunds in the misapplication of the bank's funds by making the unauthorized loan to Summit Metals Holding Company.

Counts III–V and X–XII charged Clark with various offenses arising out of Edmunds' misapplication of the bank's funds in connection with loans to Summit Metals, to Kathy Logan, and to Jacqueline Cuillo. These included aiding and abetting the misapplication, 18 U.S.C. §§ 656 and 2, unlaw-

ful interstate transportation of the resulting checks issued by M & T, 18 U.S.C. §§ 2314 and 2, and making false statements to the bank to induce it to make the loans, 18 U.S.C. §§ 1014 and 2.

Cook was charged in three counts (II, VI, VIII) with aiding and abetting the misapplication of the bank's funds, 18 U.S.C. §§ 656 and 2, in one count (VII) with aiding and abetting the making of a false statement in bank records, 18 U.S.C. §§ 1005 and 2, and in another count (IX) with unlawful transportation of a fraudulently obtained bank check, 18 U.S.C. § 2314.

Before submitting the case to the jury Judge Elfvin dismissed the conspiracy count (I) as to Cook and the charge of making false statements (XI) as to Clark. The jury found the defendants guilty of all other charges against them. Although post-trial motions were argued by the defendants to the court on March 28, 1983, Judge Elfvin, with no explanation, kept them under submission for almost one year with the result that Clark was not sentenced until March 19, 1984, and Cook on April 2, 1984. *See Styers v. Smith*, 659 F.2d 293, 296 n. 3 (2d Cir.1981); *Miller v. Erie Lackawanna Railway Co.*, 645 F.2d 140, 142, 144 (2d Cir.1981). This appeal followed.

### DISCUSSION

Title 18 U.S.C. § 656 provides that an officer of a federally-insured bank who "embezzles, abstracts, purloins or willfully misapplies any of the money, funds or credits" of the bank is guilty of a crime. The issue before us is whether the word "misapplies," which was not defined by Congress, embraces the conduct of Edmunds, Assistant Vice President and regional manager of the Lockport branch of the M & T Bank, in violating the bank's rule limiting him, without a superior's prior approval, from lending more than $75,000 to any single borrower or in the aggregate to any related or affiliated group of borrowers. Only if Edmunds' conduct constituted misapplication of the bank's funds within the meaning of § 656 could appellants' convic-

tion of aiding and abetting the alleged crime under 18 U.S.C. § 2 be upheld.

Appellants contend that to establish misapplication of bank funds in violation of § 656 the government must prove that they intended to cause financial injury to the bank. Appellants further contend that Judge Elfvin erred in his instructions, which they construe as advising the jury that the making of an unauthorized loan would in itself constitute misapplication regardless of any risk of harm to the bank. Since the term "misapplies" has no settled meaning on its face, the question of whether intent to cause pecuniary injury to a bank is an essential element of the crime, or whether proof of some lesser intent will suffice, has led to differing views among the circuits. *See, e.g., United States v. Blackwood,* 735 F.2d 142, 145–46 (4th Cir. 1984) (intent to cause pecuniary harm to bank an essential element); *United States v. Gallagher,* 576 F.2d 1028, 1046 (3d Cir. 1978) (proof that loan was made with knowledge that funds would be turned over to third party insufficient; must also show that named debtor "lacked the ability or intent to repay the loans"); *United States v. Kennedy,* 564 F.2d 1329, 1339 (9th Cir. 1977) (sufficient to show that funds were paid pursuant to misrepresentations of "the true state of the record" with intent that the bank be deceived), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Gens,* 493 F.2d 216, 221–22 (1st Cir.1974) (must show that the loans have a "natural tendency" to injure or defraud bank, such as "sham" or "dummy" loans to fictitious debtors, to persons known to be incapable of repaying, or to individuals assured that they would not be obligated to repay them, with the funds actually going to third parties).

Turning to our own circuit, the three leading decisions are *United States v. Docherty,* 468 F.2d 989 (2d Cir.1972), *United States v. Iannelli,* 461 F.2d 483 (2d Cir.), *cert. denied,* 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972), and *United States v. Fortunato,* 402 F.2d 79 (2d Cir.1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). In a characteristically

thorough opinion Judge Friendly in *Docherty* traced the history of § 656, noting (at 468 F.2d 993–94) that its predecessor (Act of June 3, 1864, ch. 106, § 55, 13 Stat. 116; 12 U.S.C. §§ 592, 597 (1945)) expressly made intent "to injure or defraud" the bank an essential element of the crime of misapplication but that these words were eliminated when the statute was revised and shortened in 1948, with the Reviser stating that the revision did not change "in any way the meaning or substance of existing law." Prior to that time it was clear that proof of some intention to injure or defraud the bank was essential and that an officer's maladministration of the bank by violating its rules without such an intent would not contravene the statute. *See United States v. Britton,* 107 U.S. 655, 667, 17 Otto 655, 2 S.Ct. 512, 522, 27 L.Ed. 520 (1883). Assuming that an intent to injure or defraud the bank continued as an element of the crime despite the 1948 revision of the statute, Judge Friendly in *Docherty* found that this requirement had not been met since the borrower was financially capable of repaying the loans and understood his obligation to do so, even though he had immediately turned over the funds to the bank's lending officer as the true recipient. Moreover, the nominal borrower had not misrepresented the purpose of the loans in his applications to the bank, which led the Circuit to conclude that there was no evidence that he had intended to deceive the bank.

In *Fortunato, supra,* although we stated that "intent to injure or defraud the bank" was a "basic element of the crime," 402 F.2d at 80, we were not confronted with the present task of determining what type of fraud or deception used by a bank officer to effectuate payment of his bank's funds to another might constitute misapplication. In that case Fortunato, a bank officer, obtained bank funds by use of fictitious loan applications and pocketed the proceeds. Intent to injure and defraud the bank was clear, notwithstanding the fact that the loans were repaid, and we held that it "was not necessary for the Govern-

ment to prove that the bank actually suffered any loss." *Id.* at 81. Similarly, in *Iannelli, supra,* a bank officer who had been specifically instructed by his superior not to make any further loans to a borrower (Iannelli) nevertheless continued to do so by arranging with third persons to open up "straw" accounts in their own or fictitious names, to misrepresent the purpose of the loans, and to turn over the funds to the ineligible Iannelli. We held that a third person participating with knowledge in the scheme was properly convicted of aiding and abetting misapplication of funds in violation of § 656 since the evidence supported the inference that he "shared the intent of Michaels [the bank officer] to injure or defraud the bank and to get money improperly into the hands of Iannelli." 461 F.2d at 486.

■ The objective of § 656, both before and after it was revised in 1948, has always been to protect federally-insured banks against *economic* loss or the threat of *economic* loss attributable to misconduct on the part of their employees, *see United States v. Wilson,* 500 F.2d 715, 720 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975), rather than to insure that banks are operated in accordance with their own internal administrative rules or policies. For instance, a bank's decision solely for political reasons not to permit loans to companies doing business with the apartheid government of South Africa would hardly justify criminal prosecution under § 656 of an officer who violated that policy even though it might subject him to discharge by the bank. Moreover, the term "misapplies" in § 656 is the last in a series of others involving conversion or economic harm ("embezzles, abstracts, purloins or wilfully misapplies any of the moneys ..."). Applying the basic principle of *ejusdem generis* it is evident that to constitute "misapplication" within the meaning of the statute the bank officer's conduct must involve some risk of pecuniary loss to the bank, not simply the violation of a rule or policy not designed to protect the bank's assets against loss.

■ Applying these principles, the record in this case is clear beyond doubt that the M & T Bank's $75,000 limit on Edmunds' authority to loan bank funds to any individual or group of related borrowers was designed to protect the bank against exposure to an increased risk of pecuniary loss and that his various loans to enterprises affiliated with or controlled by Clark and Cook as well as to persons acting as sham borrowers (e.g., Logan and Cuillo) exposed the bank to that increased risk. The proof was equally overwhelming that Clark and Cook knowingly participated in the scheme with Edmunds to defraud the M & T Bank by using these deceptive methods. Thus, appellants' conduct fell well within the scope of the term "misapplies" as it is used in § 656.

■ Nor did Judge Elfvin's charge, although hardly a model of clarity, depart sufficiently from the foregoing principles to entitle appellants to reversal. In reviewing the charge for error we are bound by the principle that it must be viewed in its entirety and not on the basis of excerpts taken out of context, which might separately be open to serious question. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *Rock v. Coombe,* 694 F.2d 908, 915–16 (2nd Cir. 1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 345 (1983). The pertinent part of the instructions regarding the § 656 term "willfully misapplies" is as follows:

> "And it must be shown that Mr. Edmunds, being an officer or employee, knowingly and willfully embezzled, abstracted, purloined, misapplied or caused to be misapplied the monies or fund or credits belonging to the bank and intrusted to its care.
>
> \*   \*   \*   \*   \*   \*
>
> "It speaks of embezzlement. To embezzle means the wrongful or willfull taking of money or property of someone else after the money or property has lawfully come within the possession or control of the person taking it. And to

take money or property means to knowingly or willfully deprive the owner of its use and benefit by converting it to one's own use with the intent to defraud the bank....

"Now it speaks also of misapplying. To misapply a bank's money or property means a willfull conversion or a taking by a bank employee or officer of the money or property to his own use or benefit, or the use or benefit of another, whether or not the property or money has been intrusted to his car[e], and with the intent to defraud the bank.

"We speak of abstracting which means to take or withdraw from. And we speak of purloining which means to steal.

"And to act with intent to defraud means to act with intent to deceive or to cheat.

"The test of misapplication is whether the bank was defrauded of something: defrauded of its funds or of its right to have custody of the funds, or of the right to make its own decisions as to how these funds were to be used.

"There is some evidence in this case about intention or lack of intention to repay loaned bank funds, and I tell you that intention to repay any of the loans in question in this case would be pertinent or relevant only if you are considering that aspect of defraudation which involves taking away the bank's funds. Now, if in that kind of consideration you find that there was an intention to repay, such intention would mean that there was no purpose to defraud. But defraudation within the meaning of this case can and does have a broader meaning. If a bank is robbed of its rights to deal with have to do with [sic] its monies and/or its rights to make its own decisions concerning its monies and its loans, the bank is as defrauded as if its monies were stolen by misrepresentations; and in this consideration of defraudation, an intent to repay has no significance.

"A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be prom[o]ted, is nonetheless a violation of the statute if the necessary effect is or may be to injure or defraud; that is, to deceive or cheat the bank.

"And when a subordinate loan officer makes an unauthorized loan, he in the eyes of the law misapplies the funds of the bank.

\*     \*     \*     \*     \*     \*

"You, of course, may not find a defendant guilty unless you find beyond reasonable doubt that every element of an offense as defined in these instructions was committed by some person or persons, and that the defendant participated in its commission.

\*     \*     \*     \*     \*     \*

"The mere fact that money was given by Edmunds to a defendant is in and of itself insufficient to sustain a conviction without first finding that such defendant acted with the requisite intent and knowledge to aid and abet or cause a misapplication of the funds of the bank.

\*     \*     \*     \*     \*     \*

"The Government need not prove that Edmunds or Clark or Cook intended to deprive the bank of its money permanently; and the Government need not prove actual loss to the bank. It is sufficient if it is shown beyond a reasonable doubt that the particular individual intended to deprive the bank of its right to do with its money what it otherwise would or could have done."

Appellants rely on phrases taken out of context, such as "defrauded ... of the right to make its own decisions as to how these funds were to be used"; "robbed of its rights to deal ... with its monies and/or its rights to make its own decisions concerning its monies and its loans"; "when a subordinate loan officer makes an unauthorized loan, he in the eyes of the law misapplies the funds of the bank"; and "[i]t is sufficient if it is shown ... that the particular individual intended to deprive the bank of its right to do with its money what it otherwise would or could have done."

■ If these excerpts alone formed the substance of the district court's charge it might give the erroneous impression that violation of a bank rule that was not designed to protect the bank against a monetary risk could nevertheless constitute misapplication of bank funds within the meaning of § 656. In the context of this case, however, the only bank rule at issue was the $75,000 limit on Edmunds' lending authority, a rule unquestionably designed to reduce the bank's risk of monetary loss. Read against the undisputed evidentiary background here, the direction in the charge that the jury could convict if it found that the defendants had intentionally aided and abetted Edmunds in making an unauthorized loan was equivalent to a charge authorizing a conviction if the jury found that the defendants had deliberately aided Edmunds in circumventing the risk-related restrictions on his lending authority in order to obtain money for themselves. This case is therefore closer to *Iannelli,* *supra,* and *Fortunato, supra,* in which the banks were exposed to an increased risk by reason of the violations of their rules than to *Docherty* in which, because the nominal borrower was financially responsible and understood that he was obligated, there was no additional risk to the bank. In any event, even if some of Judge Elfvin's instructions are deemed erroneous, the error was harmless beyond any reasonable doubt in view of the overwhelming proof of the appellants' guilt. *Cf. Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ The remaining claims of error asserted by appellants need little discussion. There was ample evidence to support the conviction of Cook. The proof justified an inference that he arranged with Edmunds to make the loans to RCR and to Andes Contracting, Inc., with the intent to circumvent the bank's restrictions on Edmunds' lending authority and to use the proceeds for himself. Indeed, some of the proceeds of the loan to RCR were lent by Cook to Edmunds, which the latter had demanded as a condition for approving the RCR loan. Cook's presence when the signature of his father Hubert Cook, nominal president of Summit Metals, was solicited for the purpose of obtaining a loan in its name and Cook's later presence when the loan was made, coupled with his knowledge of the bank's restriction on Edmunds' lending authority, supported an inference that he was engaged in aiding and abetting a willful violation of § 656. The evidence similarly suffices to support Cook's conviction for aiding and abetting the making of a false statement by Edmunds in the bank's records in violation of 18 U.S.C. §§ 1005 and 2,[4] *United States v. Kennedy, supra,* 564 F.2d at 1341, and his conviction for transporting a converted check in violation of 18 U.S.C. §§ 2314 and 2.

■ Nor did the district court err in exercising its discretion, which is broad, to deny Cook's motion for a severance. *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Although Cook's role in the scheme to defraud the bank was less important than that of Clark, their differing levels of culpability would not justify a severance. *United States v. Carson,* 702 F.2d 351, 366 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983). No substantial prejudice from the joinder of Cook and Clark is shown. There were less than a dozen transactions. The court repeatedly instructed the jury that it must consider the evidence as to each defendant separately and advised the jury as to what evidence could be considered against each. The limitation on Cook's cross-examination of Clark was largely attributable to the defendants' decision, after ample exploration by the court and counsel of potential conflict of interest problems that might arise, to continue joint representation by the same

---

**4.** Cook's brief challenges the sufficiency of the evidence for a conviction under 18 *U.S.C.* § 1014, which prohibits the making of a false statement with the intent to influence a bank.

Cook was not charged under that section, however, and the cases he cites are accordingly inapposite.

counsel. Moreover, the point that Cook now claims he was foreclosed from making on cross-examination of Clark, that the funds deposited by Clark in the Monex International account belonged to Cook and were not the proceeds of a loan to Summit Metals, had been admitted by Clark upon cross-examination of him by the government, rendering unnecessary duplicative proof by cross-examination. *See United States v. Praetorius,* 622 F.2d 1054, 1061 (2d Cir.1980) (as modified on reh'g), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *United States v. Coven,* 662 F.2d 162, 170 (2d Cir.1981), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982).

■ Cook also contends that the trial judge erred in admitting into evidence under Fed.R.Evid. 801(d)(2)(E) (co-conspirator's statements) a business record of Monex International, including a telephone log for a joint account of Cook and Clark containing a hearsay statement by Clark, shortly prior to the time of the conspiracy alleged in the indictment, to the effect that Cook was his partner. The hearsay reference, however, although inadmissible as a co-conspirator's statement in furtherance of the alleged conspiracy, was clearly harmless for the reason that the record contains a substantial amount of other proof as to the joint activities of Cook and Clark, including testimony that Cook's own money (not proceeds from the Summit Metals loan) was invested at Monex.

■ Lastly we hold that Judge Elfvin did not err in denying Cook's post-trial motion under Fed.R.Crim.P. 33 for a new trial based on the discovery that Clark, who denied on the witness stand that he had prepared the fraudulent Summit Metals financial documents, had in fact done so. Absent proof that the evidence could not with due diligence have been discovered at the time of trial and that it would probably have led to an acquittal of Cook, the motion was properly denied. *See United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980); *United States v. Slutsky,* 514 F.2d 1222, 1225 (2d Cir.1975).

The judgments of conviction are affirmed.