UNITED STATES of America,

v.

Ida MOSS, Defendant.

No. 85 Cr. 576–CSH.

United States District Court,
S.D. New York.

Jan. 22, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; David Spears, Asst. U.S. Atty., of counsel.

Caesar D. Cirigliano, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant; Leonard F. Joy, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The United States charged defendant Ida Moss in a two count indictment with two substantive violations of 18 U.S.C. § 656. The defendant having waived a jury, trial was to the Court. The Government asserts alternative bases of Moss's culpability: as a principal, and as an aider and abettor under 18 U.S.C. § 2.

At the pertinent times Moss was an employee of the Chemical Bank branch at 55 Water Street in Manhattan. The Chemical Bank (hereinafter "Chemical") is insured by the Federal Deposit Insurance Corporation.

18 U.S.C. § 656 provides in part:

"Whoever, being an ... employee of ... any insured bank ... embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank *or any moneys, funds, assets or securities intrusted to the custody or care of such bank,* or to the custody or care of any such ... employee ..., shall be fined not more than $5,000 or imprisoned not more than five years, or both; ..." (emphasis added).

In quoting from the statute, I have emphasized the phrase upon which, given the facts of the case, the Government particularly relies.

### I.

*Chemical's "Lockbox" Operation*

At its 55 Water Street branch, Chemical maintains a "remittance banking" department, also known as a "lockbox" department. I shall use the latter phrase.

Chemical offers its lockbox services to depositors whose business generates large numbers of checks payable to the depositors. Rather than bringing its checks to the bank for individual deposit, such a depositor instructs its debtors to mail checks to a post office box maintained by Chemical. A bank employee picks up the mail at the post office daily. The mail is then delivered to the lockbox department of the bank, which at the pertinent times employed about 70 people.

Checks coming into the lockbox department are processed by bank employees with such titles as "mail extractors," "work flow coordinators," "listers," and "data capture clerks." These job titles accurately reflect what the individuals do. In short, each check coming into the lockbox department is "extracted" from its envelope, photocopied, reviewed for negotiability, entered on a listing tape compiled in respect of the particular payee-depositor, and its details punched into the computer. The checks are then deposited in the appropriate account. The photocopies of the checks, together with accompanying invoices or other documents, are mailed to the depositor.

### II.

*The Scheme By Which the Lockbox Operation Was Compromised*

The record shows that on five separate occasions, Chemical's lockbox operation was victimized by individuals employing essentially the same method of operation.

That method involved removing a check from the lockbox department; altering the name of the payee; opening a bank account in the name of the altered payee; depositing the check in that account; and thereafter withdrawing the proceeds.

The method may be illustrated by what happened to the check referred to in count one of the indictment. That check, GX8, was drawn by the Peltz Food Corporation in the amount of $5,131.34, and made payable to "Aicco." "Aicco" is an acronym for the A-1 Credit Corporation, a premium finance company. That is to say, Aicco funds the large insurance premiums of its commercial customers, and then bills its customers for reimbursement (plus com-

missions) on a monthly basis. Thus Aicco is the sort of Chemical depositor whose business generates large numbers of checks, making it a suitable recipient of lockbox services.

The check in question, as the analysis of the evidence *infra* will show, was stolen from the lockbox department. The name of the payee, "Aicco," was altered so that it read "Aicconetta Winston." Thereafter an account was opened in the name of "Aicconetta Winston" at the 15 Beaver Street branch of the Seamen's Bank for Savings, and the Peltz Food Corporation check in question deposited in that account under a forged endorsement in blank reading "Aicconetta Winston." Thereafter the funds were withdrawn.

The Peltz Food Corporation check referred to in the first count of the indictment, GX8, was dated May 10, 1983. The check described in the second count of the indictment, GX9, dated May 9, 1983, was drawn by Boson Equipment, Inc. to the order of Aicco in the amount of $5,870.84. That check suffered the same fate.

Evidence adduced by defendant shows that the same method of operation was followed both before and after the diversion of the two checks referred to in the indictment. Specifically, on January 10, 1983 the New Haven News Agency, Inc. drew a check in the amount of $4,423.35 to the order of "Dell," presumably the well-known publishing house, and a Chemical depositor. The name of the payee was altered to "Dellamarva de Hargrove," and deposited in an account opened under that fictitious name at the Greenpoint Savings Bank in Brooklyn. This check is DXA on the trial.

On June 21, 1983, Labor King Temporaries drew a check, DXC, in the amount of $5,836.11 payable to Aicco. The payee's name was altered to read "Aiccoriel Ram," and deposited in an account opened under that name at the Wall Street branch of the Emigrant Savings Bank.

Finally, on July 5, 1983, Top Form Mills, Inc. drew a check, DXB, in the amount of $7,078.88 to the order of Aicco. Again, Aicco's name was changed to "Aiccoriel Ram" and deposited at the Wall Street branch of Emigrant Savings Bank.

These funds were, in consummation of the scheme, eventually withdrawn from those accounts.

### III.

*The Employment of Ida Moss at Chemical Bank*

The evidence shows that the Aicco check, GX8, was processed in Chemical's lockbox department on May 12, 1983. The Aicco check, GX9, was processed on May 16, 1983.

At those times, defendant Ida Moss was employed in the lockbox department as a lister and data capture clerk. She worked the second shift in the lockbox department, which operates from 8:00 a.m. to 4:00 p.m. The first shift is from 10:00 p.m. to 6:00 a.m. Ms. Moss was originally sent to Chemical by Office Force, a temporary employment agency. She worked at Chemical approximately a year, leaving Chemical's employ on July 15, 1983. Chemical's personnel file, GX27, contains the notation for her leaving: "Not enough money."

### IV.

*The Evidence of Defendant's Involvement With the Two Checks Referred to in the Indictment*

The Government offered evidence from witnesses qualified to testify on the subjects of fingerprints and handwriting. I found these witnesses, during their direct and cross-examination, to be forthright and candid. I regard their findings and opinions, as testified to, to be honestly held, and accurate within the limitations of the respective disciplines.

Having said that much, I turn first to the documentary evidence relevant to the opening of the "Aicconetta Winston" account at the Seamen's Savings Bank, and the subsequent deposits and withdrawals. These transactions had the inevitable consequence of generating pieces of paper.

The Aicconetta Winston account at Seamen's was opened on May 13, 1983. The person opening an account is required to fill out a new account card giving certain personal information. The new account card in question is in evidence as GX11. Charles Haywood, the Government's handwriting expert, concluded on the basis of his comparison with the new account card and known exemplars of Moss's handwriting, that Moss filled out all entries on the new account card except for two initials, presumably those of a teller. I reach the same conclusion on the basis of my own lay examination.

Furthermore, certain of the information furnished on the new account card ties Moss to its subscriber, in a strongly suggestive fashion. The Social Security number put down for "Aicconetta Winston" was identical to that of Ida Moss, except for the change of two numbers of the 9-digit series. The year of birth for Aicconetta Winston is the same as defendant's year of birth. The name of Aicconetta Winston's equally fictitious father is given as "Nathan Winston"; "Nathan" is the middle name of Moss's husband. Defendant says all this is coincidence, arguing that these easily avoidable similarities would be so foolish as to be almost exculpatory of defendant. But I think it more plausible to infer that defendant, a relatively unsophisticated individual, confronted with an unexpected need to furnish biographical details on the spot, simply could not improvise that quickly.

In short, the Government has satisfied me beyond a reasonable doubt that defendant executed the Aicconetta Winston new account card at Seamen's.

At the same time, a $10 cash deposit was made to open the account. That generated a new account deposit slip, GX13. Haywood gave his opinion that the handwriting on the deposit ticket is probably not that of Moss. That is not surprising, since the testimony of John McGloin, a Seamen's officer, indicated that the new account deposit ticket is customarily filled out by the teller opening the account, and not by the depositor.

However, the Peltz Food Corporation check originally payable to Aicco, GX8, was also deposited into the Aicconetta Winston account at Seamen's on May 13. Haywood testified, and I accept, that the endorsement on the back of that check, "Aicconetta Winston," was written by Moss. So was the deposit ticket, GX14, covering that deposit.

Turning to the Boson Equipment, Inc. check, GX9, it was deposited in the Aicconetta Winston account at Seamen's on May 18, 1983. Haywood testified that the endorsement on that check and the deposit slip executed on that date, GX15, were probably written by the same person; but that that person was probably *not* Ida Moss.

The situation is different with respect to the three withdrawal slips which evidence the next activity in the Aicconetta Winston account. A withdrawal of $5,000 was made on May 23, 1983; $3,000 was withdrawn on June 1; and $2,800 on June 3. Haywood testified, and I accept, that, with the exception of one or two entries which I do not consider material, these withdrawal slips, GX19, 22 and 23 respectively, were filled out by Ida Moss.

As for fingerprints, no probative evidence emerged. Max Jarrell, an FBI fingerprint expert, examined the checks and other documents generated by the Aicconetta Winston account: GX8, 9, 11, 13, 14, 15, 18, 19, 22 and 23. Latent prints could be detected only on GX14, 15, 22 and 23. The other exhibits yielded no latent prints at all. The prints recovered from the four identified exhibits did not match those of defendant Moss; but I do not regard this as exculpatory in any real sense, owing to the fact (reflected by these very exhibits) that a document can be handled by many people, and yet not yield a single latent print.

It is also worth noting that none of the three other checks deposited to fictitious accounts in other banks, or the documents

generated by those accounts, contained handwriting identified as that of defendant Moss. Latent fingerprints were found on some of those documents; they did not belong to Moss. Indeed, Government counsel stipulated on the trial record that Moss "had nothing to do" with the three other checks, or the fictitious accounts through which those checks were cleared.

## V.

*Sufficiency of the Government's Proof Against Ida Moss*

■ The elements expressly derived from 18 U.S.C. § 656, in the context of this case, require the Government to prove beyond a reasonable doubt that Ida Moss, while (1) an employee of (2) a federally insured bank, (3) embezzled, abstracted, purloined or willfully misapplied funds of the bank, or funds intrusted to its custody or care; or that she aided and abetted another in doing so, 18 U.S.C. § 2.

In cases involving bank officers charged with "misapplication" of bank funds, the Second Circuit has in a series of decisions engrafted an additional element upon the offense: that the defendant have the specific intent to injure or defraud the bank. *See, e.g., United States v. Clark,* 765 F.2d 297 (2d Cir.1985); *United States v. Docherty,* 468 F.2d 989 (2d Cir.1972); *United States v. Iannelli,* 461 F.2d 483 (2d Cir.), *cert. denied,* 409 U.S. 980, 93 S.Ct. 345, 34 L.Ed.2d 243 (1972); *United States v. Fortunato,* 402 F.2d 79 (2d Cir.1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). Comparable authority is found in other circuits, *see, e.g., United States v. Beran,* 546 F.2d 1316, 1322 (8th Cir.1976), *cert. denied,* 430 U.S. 916, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

In the case at bar, there is no doubt that defendant Moss was an employee at Chemical, a federally insured bank, at the time when the two AICCO checks described in the indictment were wrongfully removed from the bank's care and custody. Defendant's able counsel disputes none of these elements.

Defendant's arguments, in summation and subsequent briefs of counsel, were:

(1) Moss's apparent non-involvement in three of the five checks diverted in this manner showed that someone else was the mastermind of the scheme, and presumably the actual thief.

(2) The only evidence against Moss was that of the handwriting expert in respect of the two Seamen's Bank deposits, together with the noted biographical similarities on the new account card. Defendant challenges the accuracy of the handwriting expert, and seeks to explain away the similarities.

(3) The Government had not proved that Moss stole the checks from Chemical, or (within the context of aiding and abetting) that she knew someone else had done so.

(4) The Government had not proved the requisite element of intent to injure Chemical economically. That argument was expanded in defendant's first post trial brief as follows:

"It is clear, then, that to convict a defendant for violating § 656, it must be shown beyond a reasonable doubt that the alleged conduct placed the bank in a position where there was a potential for economic loss. But here the Government's case involved no evidence of Chemical's risk of economic loss. Furthermore, the circumstances were such that Chemical in fact was exposed to *no* risk of economic loss. Seamen's Bank for Savings accepted the altered checks and therefore it became liable for the losses. UCC §§ 3–405, 3–417, 3–419, 4–207; *See generally* White & Summers, *Handbook on the Uniform Commercial Code* §§ 15, 16 (2d Ed.1980). There was no risk to Chemical, no way that the 'natural result' of Ida Moss's alleged conduct could have been to injure or defraud Chemical. Even if Ida Moss knew that the checks came from Chemical, there is no showing that Chemical faced any risk of economic loss."

■ As for defendant's arguments listed under (2), I reject them for the rea-

sons already given. I find that the hand-writing expert correctly identified defendant's handwriting; and that the biographical similarities are incriminatory of Moss, rather than the reverse.

■ I do accept defense counsel's submission that the Government has not proved, beyond a reasonable doubt, that Moss herself stole the two checks charged in the indictment. Clearly other people were involved in this rather original scheme. There is no reason to suppose that Moss was the only Chemical lockbox employee so involved. The probabilities, in my view, point the other way. In consequence, while it is certain that the checks were stolen, and possible that Moss stole them, it is equally possible that someone else stole them. That proof is not sufficient to brand Moss as the thief.

■ Hence the Government's reliance upon that alternative basis of criminal liability: aiding and abetting. If Moss is to be convicted in this case, it must be as an aider and abettor. That implicates the question of *knowledge*: has the Government proved Moss knew the checks were "embezzled, abstracted, purloined or willfully misapplied" from Chemical Bank?

■ The proof shows this much: Moss had to know something illicit was going on. She executed the forms necessary to open the Seamen's Bank account in the fictitious name of "Aicconetta Winston," using a fictitious personal history for that purpose; and fraudulently endorsed the name "Aicconetta Winston" on the back of the first check listed in the indictment. The only reasonable inference I can draw is that Moss knew this check was *stolen.*

■ But did she know it was stolen *from the custody or care of Chemical Bank?* I accept Mr. Joy's submission that such knowledge is necessary to sustain a conviction under § 656 and the indictment as drawn. But I conclude that the Government's evidence is sufficient.

I would perhaps take a different view if Moss had not been an employee of the Chemical lockbox department at the time these checks were diverted, altered, deposited and then withdrawn. In those hypothetical circumstances, defense counsel could argue with more force that such an individual, while assisting another in a clearly suspect scheme, had not been shown to know the source of the altered checks.

But Moss, employed by Chemical's lockbox department for about a year when she left in July 1983, had accordingly been so employed for nine months prior to the diversion of the checks in question. She was a "lister" and a "data capture clerk." Those activities are clarified by the testimony of George Sandoval, the Chemical officer in charge of the department:

Q. Tell the court what the Chemical Bank lockbox department does with checks that are remitted to it on behalf of its customers.

A. Well, we pick them up at the post office daily. It is then delivered to the lockbox department where we have what we call mail extractors. The mail extractors are then responsible for pulling out the check and bill out of the envelope. While pulling the checks and documents, they are making a batch of checks and a batch of documents.

Subsequent to that they batch the documents in one group, the checks in another. The documents or what I call bills stay with them. Checks go to what we call the work flow coordinator. The work flow coordinator then delivers these checks to what we call a photocopy room. Each and every check is photocopied, the checks are banded again, the photocopies are banded again and returned to the work flow coordinator. The work flow coordinator then reviews each check for negotiability, basically making sure that the documents and signatures are in order and they are not postdated or stale dated. Once that is complete, they will take the photocopies and checks to what we call a lister. The lister is then responsible for listing the dollar amount from each photocopy and creating what we call a listing tape. The

listing tape is then banded to the photocopies as well as the checks, and then delivered or picked up by another work flow coordinator who brings it to a data entry station.

The data entry station area is then responsible for keying in the check amount, and they are responsible for keying in the check amount and making sure that the checks prove back to the listing. All that data is fed into a computer where it is maintained. The photocopies go back to the mail personnel or the extractor where he staples the photocopy to a corresponding envelope and bill and sends it back out to the customer.

\* \* \* \* \* \*

Q. Now, you said that after they go to the photocopy area they go to a lister; is that correct?

A. After they go to the photocopy area they go back to the work flow coordinator, then the lister.

Q. And then to the lister, and from the lister you said that they go to the data capture area or the data entry area?

A. That's correct.

Q. What relationship if any is there between the individuals who work as listers and the individuals who work in the data entry area?

A. Basically they are interchangeable. One works as a data capture and simultaneously works—and on occasion works as a lister as well.

Q. How is it decided who will work as a lister on any particular day?

A. Normally either the work floor coordinator or the supervisor will select somebody at the beginning of the day. Tr. 23–24, 26.

■ I find that when defendant Moss fraudulently endorsed the Peltz Food Corporation check payable to the order of "Aicco" and altered to "Aicconetta Winston," she knew she was dealing with a check payable to a Chemical depositor, namely Aicco, which had been improperly removed from the bank. I base that finding on three factors:

(a) Moss had been processing the checks of Chemical lockbox depositors long enough to become familiar with their names. I appreciate the force of Mr. Joy's argument that Moss's responsibilities focused upon preparation of lists of numbers, or the feeding of numbers into a computer. I accept his characterization, as did Mr. Sandoval in cross-examination, that this is a repetitive, "mind-numbing job." Nevertheless, the lister has before her the entire check or its photocopy when she prepares her lists; Aicco used Chemical's lockbox service precisely because its business generated large quantities of checks; and it is not fanciful to suppose that, over time, an employee such as Moss picks up and retains the names of depositor-payees, even by a sort of visual, subliminal osmosis.

(b) As the checks work their way through the system described by Sandoval, pencilled notations are made on them. Such a notation appears on this check. Moss would have been familiar with it.

(c) For the reasons stated, it is more likely that at least one other Chemical employee was involved in the scheme. Accepting that the Government has not proved that Moss stole the checks herself, I infer from the evidence that she aided and abetted another Chemical lockbox employee, which implies discussions between them about what they were doing; and that they were each well aware of the source of the checks.

I do not regard this finding of knowledge as impermissibly speculative. It seems to me a fair inference to draw from all the evidence; and to establish knowledge on the part of Moss beyond a reasonable doubt.

What I have just said disposes of a subsidiary argument made on behalf of defendant with respect to the second check identified in count two of the indictment. That is the Boson Equipment Incorporated check in the amount of $5,870.84, also payable to Aicco. That check was deposited in the "Aicconetta Winston" account at Seamen's Bank on May 18, 1983. As noted, the Government's handwriting expert has

concluded that the endorsement on that check and the deposit slip were probably written by the same person; but that that person was probably not defendant Moss. From this, Moss argues that there is no evidence connecting her with the check referred to in the second count of the indictment.

■ I do not agree. This particular evidence does no more than confirm what we already knew: that someone else besides Moss was involved in the scheme. However, Moss again appears on the scene, through the testimony of the handwriting expert, when, on May 23, June 1, and June 3, 1983, by means of three separate withdrawal slips, all the money was taken out of the Aicconetta Winston account with the exception of a few hundred dollars. Moss executed each withdrawal slip. That is to say: while Moss did not make one of the deposits, she made all the withdrawals. I may reasonably infer that, from the total amount of the withdrawals, Moss knew that an additional, fraudulent deposit had been made into this fraudulent account; and that another stolen Aicco was used for the purpose. That is sufficient evidence to impute the requisite knowledge to Moss, as an aider and abettor, on both counts.

The last issue is that of intent: an element which I asked counsel to brief particularly.

■ The requisite intent underlying a § 656 violation, whatever that intent may be, must be shown by the Government even on an aiding and abetting theory. As stated in *United States v. Docherty, supra:*

"A violation of 18 U.S.C. § 656 requires, so far as here relevant, a situation where a bank officer, director, agent or employee 'embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank....'" When a defendant is charged simply as an aider or abettor, submission to the jury is warranted only if there is enough evidence to show that he knew of *such activity* of the principal and desired to forward it."

468 F.2d at 992 (emphasis added).

The line of Second Circuit authority including *Docherty* and ending (for the present) with *United States v. Clark, supra,* all deal with (1) bank officers who are charged with (2) willful misapplication of bank funds. In that particular context, the Second Circuit has said that "intent to injure or defraud the bank" is a "basic element of the crime," *United States v. Fortunato, supra,* at 402 F.2d 80. In *Clark* the court concluded:

"...to constitute 'misapplication' within the meaning of the statute the bank officer's conduct must involve some risk of pecuniary loss to the bank, not simply the violation of a rule or policy not designed to protect the bank's assets against loss."

The Second Circuit's approach to these cases was shaped by Judge Friendly's analysis in *Docherty.* Judge Friendly pointed out that the predecessor to § 656:

"...expressly made intent 'to injure or defraud' the bank an essential element of the crime of misapplication but that these words were eliminated when the statute was revised and shortened in 1948, with the Reviser stating that the revision did not change 'in any way the meaning or substance of existing law.' Prior to that time it was clear that proof of some intention to injure or defraud the bank was essential and that an officer's maladministration of the bank by violating its rules without such an intent would not contravene the statute. *See United States v. Britton,* 107 U.S. 655, 667, 17 Otto 655, 2 S.Ct. 512, 522, 27 L.Ed. 520 (1883)."

*United States v. Clark,* 765 F.2d at 302.

A bank officer's "application" of his bank's funds may be subject to more than one interpretation. The bank officer may show bad judgment, for which a reprimand may await him in the executive suite; and yet fall short of that "willful misapplication" constituting a felony under § 656. *Docherty* furnishes an example. There, the bank officer approved loans to an individual who immediately turned them back

to the officer as the true recipient. The requisite "intent to injure or defraud the bank" was not present because the nominal borrower was solvent and had not misrepresented the purpose of the loan in his application. In *Clark*, by contrast, the bank officer approved loans to the individuals in excess of bank limitations, thereby exposing the bank to that increased risk of loss which, in the Second Circuit's view, satisfied the element of intent. 765 F.2d at 303.

■ Defendant Moss was not a bank officer. She was an employee. Her actions cannot possibly be viewed in an innocent light. I conclude that in this case, the Government need not prove a specific "intent to injure or defraud" Chemical Bank, in the sense of subjecting it to increased economic risk. I base that conclusion on two reasons.

First, the crime proved at trial may fairly be characterized as "embezzlement": one of the four crimes embraced by § 656. They constitute "possible *theories* of violation of the statute," *Fortunato, supra,* at 80 (per Feinberg, Ct.J.) (emphasis added). See also 80 n. 2.

Furthermore, these possible theories of violation may contain different elements. In *United States v. Sayklay,* 542 F.2d 942 (5th Cir.1976), the Government alleged only embezzlement in violation of § 656. The conviction was reversed because, while the evidence proved willful misapplication of bank funds, it did not prove embezzlement. *See also United States v. Holmes,* 611 F.2d 329, 331 (10th Cir.1979):

> "Embezzlement is 'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it had lawfully become.' ... Misapplication covers acts not covered by embezzlement."

Two circuits have held that, in charging juries in embezzlement cases, the court need not specifically charge that it must find a specific intent to injure or defraud a bank. It is sufficient to charge that the defendant committed acts that he knew the law forbade, and that he intended to break

the law. *United States v. Scheper,* 520 F.2d 1355, 1357–58 (4th Cir.1975); *United States v. Johnson,* 447 F.2d 31, 34 (7th Cir.1971).

I hold that there is sufficient evidence in this case to establish Moss's criminal intent to aid and abet others in the crime of embezzlement under § 656.

■ However, assuming that the Government must prove specific intent to injure or defraud the bank, either because this must be regarded as a "misapplication" case, or because the element applies to all four crimes embraced by § 656, I hold that the evidence is sufficient.

■ I do not find at all appealing Mr. Joy's submission that this intent cannot exist in law because, under the Uniform Commercial Code, the economic loss will fall upon Seamen's Bank and not upon Chemical Bank. In point of fact, the question of who reimbursed whom for these checks and when is not resolved by the evidence at trial. But assuming that counsel is correct in the ultimate resolution he suggests under the UCC, I decline to apply that salutary body of commercial legislation to relieve a faithless bank employee such as defendant from the consequences of her actions, even if I were to indulge the fanciful assumption that she researched the UCC before acting.

Furthermore, the argument based on the UCC relates only to whether the Chemical Bank will be actually out of pocket; that is to say, suffer economic injury. But the intent with which we are concerned is "to injure or defraud" the bank; and those concepts are not the same. In *United States v. Angelos,* 763 F.2d 859 (1985), the Seventh Circuit dealt with a bank officer named Angelos who made unauthorized loans to himself. He appealed from his conviction on the ground that the requisite intent under § 656 had not been shown. The Seventh Circuit rejected the argument:

> "Moreover, it is important to distinguish between intent to injure and intent to defraud; either will do, and they are not the same. By lending the bank's money

in effect to himself in violation of accepted banking procedures, Angelos breached his fiduciary obligation to the bank, and it is irrelevant whether he thought, and thought correctly, that the bank would not be hurt. Intent to defraud— which means, to take financial advantage of a confidential relationship, as we noted recently in *United States v. Dial,* 757 F.2d 163, 168 (7th Cir.1985)—is all that is required to make out a violation of section 656; intent to injure the bank need not be shown."

763 F.2d at 861–62.

This analysis in *Angelos* is consistent with a line of cases holding that the breach of a bank employee's fiduciary duty, in reckless disregard of the bank's interest, is sufficient to establish the requisite intent to defraud. *United States v. Cyr,* 712 F.2d 729, 732 (1st Cir.1983); *United States v. Krepps,* 605 F.2d 101, 104 (3rd Cir.1979); *United States v. Welliver,* 601 F.2d 203, 210 (5th Cir.1979); *United States v. Franklin,* 608 F.2d 241, 244 (6th Cir.1979); *United States v. Larson,* 581 F.2d 664, 667 (7th Cir.1978).

 In the case at bar, I conclude that defendant Ida Moss, at the time she was an employee of Chemical Bank's lockbox department, aided and abetted others with knowledge, and with the requisite specific intent to defraud the bank by a course of conduct in breach of fiduciary responsibilities and in reckless disregard of the bank's interest, exposing it to inconvenience, embarrassment and claims (which the trial evidence reveals actually occurred). That is sufficient, whether or not economic injury resulted.

### Conclusion

It follows that I convict defendant Ida Moss on both counts of this indictment.

I will require a presentence report on defendant Moss.

I will sentence her on March 19, 1986 at 4:30 p.m. in Courtroom 307.

It is SO ORDERED.